## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Dayle B.,<br><br>                    Plaintiff,<br><br>v.<br><br>Andrew Saul, Commissioner of Social<br>Security,<br><br>                    Defendant. | Civil No. 3:20-cv-00359 (TOF)<br><br><br><br><br><br><br>April 28, 2021 |

### <u>RULING ON PENDING MOTIONS</u>

**I.    INTRODUCTION**

The Plaintiff, Dayle B.,[1] appeals the final decision of the Defendant, Andrew Saul, Commissioner of Social Security ("the Commissioner"), rejecting her application for Title XVI Supplemental Security Income ("SSI") benefits.  The Plaintiff has moved the Court for an order reversing the Commissioner's decision and awarding benefits.  (ECF No. 23.)  The Commissioner has moved for an order affirming the decision.  (ECF No. 28.)

The Court reads the Plaintiff's brief as raising six principal arguments.  The Court will address each of the Plaintiff's arguments in the order of the sequential evaluation process described below in Part III, rather than as they appear in her brief.  First, she contends that the Administrative Law Judge ("ALJ") improperly "rejected" the opinions of her treating providers.  (*See* Pl.'s Memo. of L, ECF No. 23-1, at 9-27.)  Second, she asserts that the ALJ did not properly assess the severity

---

[1]    Pursuant to Chief Judge Underhill's January 8, 2021 Standing Order, the Plaintiff "will be identified solely by first name and last initial" throughout this opinion.  *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

of her impairments and, therefore, "the decision is not supported by substantial evidence at step three." (*Id.* at 3-9.)  Third, she argues that the ALJ's determination of her Residual Functional Capacity ("RFC") "is not supported by substantial evidence because the ALJ rejected the opinions of all treating sources." (*Id.* at 28.)  Fourth, she argues that the ALJ failed to consider all of her physical and mental limitations when determining her RFC.  (*Id.* at 1-3.)  She states that, because of this, the RFC is not an "accurate reflection of [her] maximum capacity." (*Id.* at 3.)  Fifth, she argues that the ALJ erred in assessing her credibility.  (*Id.* at 28-32.)  Sixth, she asserts that the ALJ failed to prove that she was capable of working at Step Five, because the Vocational Expert ("VE") did not testify that there are jobs available in significant numbers in the national economy (*id.* at 32), and because the ALJ's hypothetical question did not incorporate all of her functional limitations.  (*Id.* at 33-35.)  In response to these arguments, the Commissioner asserts that the ALJ's decision was free of legal error and supported by substantial evidence.  (*See generally* Def.'s Memo. of L, ECF No. 28-1, at 2-30.)

Having carefully considered the parties' submissions and the full administrative record, the Court substantially agrees with the Commissioner.  The ALJ determined the persuasiveness of the opinions of the Plaintiff's treating providers in accordance with the new regulations.  (*See* discussion, Section IV.A *infra.*)  The ALJ properly evaluated the severity of the Plaintiff's impairments at Step Three and appropriately detailed why the Plaintiff's impairments did not meet or equal a listing.  (*See* discussion, Section IV.B *infra.*)  The ALJ did not commit reversible error in formulating the Plaintiff's RFC, and the RFC determination was supported by substantial evidence.  (*See* discussion, Section IV.C *infra.*)  The ALJ properly evaluated the Plaintiff's credibility and her subjective limitations in accordance with the regulations.  (*See* discussion, Section IV.D *infra.*)  Lastly, the ALJ properly relied on the VE's testimony, since the VE testified

that there are jobs available in significant numbers in the national economy and the hypothetical question was identical to the RFC, which was supported by substantial evidence. (*See* discussion, Section IV.E *infra*.) Accordingly, the Plaintiff's Motion for an Order reversing the final decision of the Commissioner (ECF No. 23) is **DENIED**, and the Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 28) is **GRANTED**.

## II.   BACKGROUND

### A.   Facts and Procedural History

On May 11, 2017, the Plaintiff filed an application for SSI benefits under Title XVI,[2] alleging a disability onset date of August 28, 1999. (R. 168, 187.) She claimed that she could not work because of: gastrointestinal issues, including irritable bowel disease ("IBS"), acid reflux, esophageal spasm, vomiting, and inability to digest food; breast cancer and complications associated with treatment; depression; anxiety; complications from her hysterectomy and cholecystectomy; flat feet; arthritis; low bone density; "herniated disc c4 & c5 in back" and back pain; shortness of breath; and pre-diabetes. (R. 168.)

On October 12, 2017, the Social Security Administration ("SSA") found that the Plaintiff was "not disabled." (R. 185-87.) She filed an application for reconsideration, now claiming a disability onset date of May 2, 2016. (R. 188-89.) She claimed that there had been a change in her condition, stating that her conditions were worsening, she was in "constant pain from hip

---

[2]     The Plaintiff's Statement of Facts says that she applied for Title II disability insurance benefits ("DIB") as well. (Pl.'s Stmt. of Facts, ECF No. 23-2, at 1.) There is no evidence on the record to suggest that this is the case. Both application forms indicate that she only applied for benefits under Title XVI (R. 187, 207), and only SSI under Title XVI was considered at the hearing level. (R. 14.) As such, there is no DIB claim or decision that is before the Court for review. *See* 42 U.S.C. § 405(g). Therefore, the relevant time period began on May 11, 2017. *See Frye ex rel. A.O. v. Astrue*, 485 Fed. App'x 484, 488 n.2 (2d Cir. 2012) (summary order) (noting that the relevant time period for an SSI benefits application is "the date the SSI application was filed, to . . . the date of the ALJ's decision").

bone," and she was forgetful.  (R. 189.)  Her claim was denied on reconsideration on August 17, 2018.  (R. 205-207.)  She requested a hearing before an ALJ, which was held on September 3, 2019. (R. 37.)  The ALJ issued an unfavorable decision on December 2, 2019 (R. 11-28), and the Appeals Council denied the Plaintiff's request for review.  (R. 1.)  On March 16, 2020, she sought review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  (Pl.'s Compl., ECF No. 1.)  The Commissioner filed the Social Security Transcripts on June 9, 2020.  (ECF No. 17.)  The Plaintiff filed her motion to reverse and remand on September 25, 2020 (ECF No. 23), and the Commissioner filed his motion to affirm on November 24, 2020.  (ECF No. 28.)

**B.     The ALJ's Decision**

As discussed below in Part III, the ALJ was required to follow a five-step sequential evaluation process in considering the Plaintiff's claim for benefits.  At Step One of his analysis, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since May 11, 2017, the application date.  (R. 16.)  At Step Two, the ALJ found that the Plaintiff suffers from the severe impairments of degenerative disc disease, IBS, esophageal spasm, depressive disorder, and anxiety disorder.  (R. 16.)  At Step Three, the ALJ found that the Plaintiff's impairments or combination of impairments did not meet or equal a listed disability enumerated in 20 C.F.R. § 404, Subpart P., Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).  (R. 17-19.)  Next, the ALJ determined that the Plaintiff retained the following RFC:

> [T]o perform light work as defined in 20 CFR 416.967(b) except she can occasionally climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; occasionally balance; occasionally stoop; occasionally kneel; occasionally crouch; occasionally crawl; can perform simple, routine tasks; and have occasional contact with the public.

(R. 19-27.)  At Step Four, the ALJ found that the Plaintiff could not perform any of her past relevant work.  (R. 27.)  Finally, at Step Five, the ALJ relied on the testimony of a VE to find that there are jobs that exist in significant numbers in the national economy that the Plaintiff can

perform, including "Assembler, Production," "Sub Assembler, Electrical Equipment," and "Compression Molding Machine Tender." (R. 27-28.) Accordingly, the ALJ determined that the Plaintiff was not disabled since the date the application was filed. (R. 28.)

## III.   APPLICABLE LEGAL PRINCIPLES

To be considered disabled under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'" *Smith v. Berryhill*, 740 F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)).   To determine whether a claimant is disabled, the ALJ follows a familiar five-step evaluation process.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity . . . ." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)). At Step Two, the ALJ analyzes "whether the claimant has a severe impairment or combination of impairments . . . ." *Id.* At Step Three, the ALJ evaluates whether the claimant's disability "meets or equals the severity" of one of the specified impairments listed in the regulations. *Id.* At Step Four, the ALJ uses an RFC assessment to determine whether the claimant can perform any of her "past relevant work . . . ." *Id.* At Step Five, the ALJ assesses "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience." *Id.* The claimant bears the burden of proving her case at Steps One through Four. *Id.* At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r,* 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this Court "perform[s] an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). The Court's role is to

determine whether the Commissioner's decision is supported by substantial evidence and free from legal error. "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted). The decision is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner. *See Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . .") (citations omitted). Though the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (quotation marks and citations omitted). When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment. "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

The Commissioner's conclusions of law are not entitled to the same deference. The Court does not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## IV.   DISCUSSION

### A.   The ALJ Properly Weighed the Opinion Evidence in the Record in Accordance with the SSA's New Regulations Regarding the Evaluation of Medical Evidence

Previously, when ALJs evaluated opinion evidence, they followed the "treating physician rule."  Under the treating physician rule, the ALJ was required to accord a treating physician's opinion controlling weight when the opinion was "well-supported by medical findings and not inconsistent with other substantial record evidence."  *Shaw*, 221 F.3d at 134 (citing 20 C.F.R. § 416.927(d)(2)).  However, the SSA amended the regulations relating to the evaluation of medical evidence for disability claims filed on and after March 27, 2017.  *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844-01, at *5844 (Jan. 18, 2017).  Because the Plaintiff's claim was filed on May 11, 2017 (R. 168, 167), the new regulations, codified at 20 C.F.R. § 416.920c, apply.[3]

Under the new regulations, the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative

---

[3]    One court in this circuit has expressed doubt that the treating physician rule was eliminated via the new regulations, since "the treating physician rule originated in this Circuit as a judicially created standard" and it was "not persuaded that the removal of the rule from SSA Regulations for applications on and after March 27, 2017 relieves an ALJ of the obligation to apply it."  *Caldwell v. Saul*, No. 19-CV-6584L, 2020 WL 6273944, at *2 n.1 (W.D.N.Y. Oct. 26, 2020).  However, the Second Circuit has held in previous cases that the SSA's regulations served to abrogate circuit law, *see, e.g., Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009), and other district courts in this circuit have concluded that the treating physician rule was abrogated by the new regulations.  *See Distefano v. Berryhill*, 363 F. Supp. 3d 453, 463 n.4 (S.D.N.Y. 2019) (finding that the new regulations eliminated the treating physician rule); *see also Davenport v. Saul*, No. 3:18-CV-1641 (VAB), 2020 WL 1532334, at *29 n.18 (D. Conn. Mar. 31, 2020) (same).  Others have applied the new regulations to post-March 27, 2017 applications without questioning whether the treating physician rule still applies.  *See Jacqueline L. v. Comm'r of Soc. Sec.*, No. 6:19-CV-06786 (EAW), 2021 WL 243099, at *2-6 (W.D.N.Y. Jan. 26, 2021); *Andrew G. v. Comm'r of Soc. Sec.*, No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5-6 (N.D.N.Y. Oct. 1, 2020); *Soto v. Comm'r of Soc. Sec.*, No. 19-CV-4631 (PKC), 2020 WL 5820566, at *3-4 (E.D.N.Y. Sept. 30, 2020); *Brian O. v. Comm'r of Soc. Sec.*, No. 1:19-CV-983 (ATB), 2020 WL 3077009, at *4-5 (N.D.N.Y. June 10, 2020).  Furthermore, the Plaintiff did not raise this issue in her brief.  In fact, she agreed that the

medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 416.920c(a). Instead, the ALJ evaluates the medical opinions using the five factors listed in § 416.920c(c)(1)-(c)(5). These factors are: "(1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, purpose and extent of the treatment relationship, and the examining relationship; (4) specialization; and (5) any other factors that 'tend to support or contradict a medical opinion or prior administrative medical finding.'" *Jacqueline L v. Comm'r of Soc. Sec..,* No. 6:19-cv-06786 (EAW), 2021 WL 243099, at *3 (W.D.N.Y. Jan. 26, 2021) (quoting § 416.920c(c)). Of these factors, supportability and consistency are the most important, and ALJs must explicitly articulate how they considered them. *See* § 416.920c(b)(2). They may, but are not required to, explain how they considered the other factors. *Id.* When considering "supportability," ALJs are directed to look to "the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her medical opinion(s) . . . ." § 416.920c(c)(1). The "consistency" factor goes to the opinion's consistency with other evidence in the record. "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." § 416.920c(c)(2).

Though treating physicians' opinions are no longer entitled to controlling weight, their importance is still recognized. "Even though ALJs are no longer directed to afford controlling weight to treating source opinions—no matter how well supported and consistent with the record they may be—the regulations still recognize the 'foundational nature' of the observations of

---

regulations abrogated the rule, and discussed the application of the new standards. (*See* Pl.'s Memo. of L., ECF No. 23-1, at 9-10.)

treating sources, and 'consistency with those observations is a factor in determining the value of any [treating source's] opinion.'" *Shawn H. v. Comm'r of Soc. Sec.*, No. 2:19-CV-113, 2020 WL 3969879, at \*6 (D. Vt. July 14, 2020) (alteration in original) (quoting *Barrett v. Berryhill*, 906 F.3d 340, 343 (5th Cir. 2018)).

In this case, the administrative record contains the following opinion evidence: two impairment questionnaires and three letters from John C. Chapdelaine, LADC, M.Ed. (R. 684-88, 772, 1986, 1988, 1990-95); a medical exemption report from Susan Wiskowski, M.D. (R. 818-20); a total and permanent disability form, a medical exemption report, and a medical report from Monique Martin, M.D. (R. 821-25, 1257-59, 2014-20); a medical source statement from Ahmed Masoud, M.D. (R. 697-99); disability determination explanations at the initial level from Warren Leib, Ph.D. and Maria Lorenzo, M.D. (R. 178-85); and disability determination explanations at the reconsideration level from Carlos Jusino-Berrios, M.D. and Arvind Chopra, M.D. (R. 197-203.) After considering these opinions, the ALJ stated how persuasive he found them.[4] He found that LADC Chapdelaine's opinions were "somewhat persuasive," though the more restrictive limitations he assessed in 2019 were not persuasive. (R. 24-25.) The opinions of Dr. Wiskowski and Dr. Martin were not persuasive. (R. 25.) The ALJ did not provide articulation of Dr. Masoud's opinion. (R. 26.) The Court will address each provider and the ALJ's evaluation of his or her opinions in turn.

### i.      John C. Chapdelaine, LADC, M.Ed.

The record contains five "opinions" attributed to LADC Chapdelaine. The first is an impairment questionnaire, dated July 27, 2017 (R. 684-88); the second is a letter dated November

---

[4]      The ALJ did not specifically identify the weight afforded to each medical opinion. The new regulations do not require the ALJ to assign a specific weight to each opinion—they only require that the ALJ articulate how he considered the medical opinions and their persuasiveness. *See* § 416.920c(a); *Jacqueline L.*, 2021 WL 243099, at \*4.

9, 2017 (R. 772); the third is a letter dated April 3, 2018 (R. 1988); the fourth is a letter dated August 14, 2019 (R. 1986); and the fifth is an impairment questionnaire, also dated August 14, 2019. (R. 1990-95.) The ALJ did not analyze these opinions separately, but the new regulations do not require ALJs to explicitly analyze each opinion from the same source. "[The SSA] is not required to articulate how [it] considered each medical opinion or prior administrative medical finding from one medical source individually." § 416.920c(b)(1). In other words, the ALJ may consider all of a medical source's opinions together in a single analysis, without discussing each opinion individually. *Id.* Here, the ALJ referred to the impairment questionnaire and letter from 2017 as the "2017 opinion," and to the impairment questionnaire and letter from 2019 as the "2019 opinion." (R. 24-25.) He found that LADC Chapdelaine's opinions were "somewhat persuasive," but concluded that his less-restrictive assessments from 2017 were "more persuasive" than his assessments from 2019. (*Id*.) He also concluded that LADC Chapdelaine's comments on the Plaintiff's "medical issues" were not persuasive because they were "outside the scope of his treatment." (R. 24.) A review of the record shows that the ALJ evaluated the opinions in accordance with the regulations, specifically analyzing their supportability and consistency.

The ALJ found that LADC Chapdelaine's 2017 opinion was partially supported, noting that LADC Chapdelaine's statement that the Plaintiff had "reduced to limited" abilities in task performance and social interaction was supported by the explanation that she "has anxiety and depression and has been managed on outpatient therapy." (R. 24.) He then concluded that the 2017 opinion's functional assessments were consistent with the record, and particularly with the treatment notes. (R. 24-25.) The treatment notes showed that she "demonstrated anxiety, depression, some tangential thoughts, and crying during treatment appointments," but her Mental Status Examinations ("MSEs") showed that she "remained alert, oriented, calm, cooperative, had

normal and goal-directed thought process, average intelligence, fair insight, fair judgment, no cognitive issues, and sufficient impulse control."  (R. 25; *see also* R. 733, 736, 739-40, 743, 746, 748-49, 751-52, 755-56, 757-58, 761, 936, 938-39, 945, 947, 951, 953, 956-57, 959-60, 962, 966, 968, 975-76, 982, 986, 990, 994, 998-99, 1003-1004, 1007, 1012-13, 1015, 1019, 1023, 1026, 1030, 1033, 1037, 1559, 1562, 1566, 1571-72, 1583-84.)  Therefore, he concluded that the 2017 opinion was "somewhat persuasive."  (R. 25.)

The ALJ stated that the 2019 opinion was "partially supported by [LADC Chapdelaine's] reports that the claimant frequently cries and engages in some avoidant behavior."  (R. 24.)  He concluded, however, that the restrictive limitations were inconsistent with the record as a whole. (*Id*.)  He discussed specific evidence in the record that was not consistent with the restrictive limitations in the 2019 opinion, noting that she had "moderate progress" in her mental health treatment between 2017 and 2019, she was able to manage herself, and she carried out activities of daily living such as "caring for her children, cooking, driving, and grocery shopping."  (R. 25.) The ALJ also explained that the treatment notes were inconsistent with more severe limitations. Her treating providers observed that she had anxiety, depression, tangential thoughts, and crying during appointments (R. 713-714, 717-18, 726, 736, 739, 742, 754, 944, 971, 978, 982, 986, 990, 994, 1007, 1023, 1030, 1033, 1037, 1575-76, 1578-79), but, as noted above, her MSEs often showed normal or unremarkable results.  (R. 25.)

The Plaintiff argues that the ALJ improperly focused on the MSEs, asserting that a claimant with normal MSEs can still be impaired, and the ALJ should not be permitted to discount a treating physician's opinion on that basis.  (Pl.'s Memo. of L., ECF No. 23-1, at 17-18.)  The cases that

she cites, however, are all based on the treating physician rule.  (*Id.*)[5]  Under the treating physician

rule, ALJs needed to provide "good reasons" for the weight that they assigned to the opinions of

treating physicians.  *See Burgess*, 537 F.3d at 129-30.  Under the new regulations, the opinions of

treating physicians are not entitled to any particular weight, and ALJs are permitted to discount

the persuasiveness of an opinion based on its lack of consistency with evidence from "other

medical sources and nonmedical sources in the claim"—including treatment notes and the results

of MSEs.  § 416.920c(c)(2).

Even if the treating physician rule did apply in this instance, courts in this circuit have

found that inconsistency between the treating physician's assessment of severe limitations and the

MSEs can support the ALJ's decision to give less weight to the opinion.  *See, e.g., Ayala v.

Berryhill,* No. 18-CV-124 (VB/LMS), 2019 WL 1427398, at *9 (S.D.N.Y. Mar. 12, 2019) ("An

ALJ can also decline to give controlling weight to a treating physician's opinion where

contemporaneous treatment records, including the plaintiff's largely normal mental status

examinations on both treating and consultative evaluations, did not support such severe

limitations." (internal quotation marks omitted)), *report and recommendation adopted sub nom.

Ayala v. Comm'r of Soc. Sec. Admin*., No. 18-CV-124 (VB), 2019 WL 1417220 (S.D.N.Y. Mar.

29, 2019); *Camille v. Berryhill,* No. 3:17-CV-01283 (SALM), 2018 WL 3599736, at *11 (D. Conn.

July 27, 2018) (finding that the ALJ did not err in according less than controlling weight to an

---

[5]    *See Gustafson v. Berryhill,* No. 3:18-CV-1026 (MPS), 2019 WL 4744822, at *2-3 (D.
Conn. Sept. 30, 2019) (finding that the ALJ did not follow the treating physician rule because
inconsistency between the treating physician's opinion and MSEs was not a "good reason" for
according the opinion less weight)*; Tonges v. Berryhill*, 3:18-cv-00750 (RAR), ECF No. 19, at 12-
13 (D. Conn. Sept. 27, 2018) (holding that the ALJ failed to follow the treating physician rule by
rejecting the treating physician's assessments based on treatment notes and MSEs); *White v.
Berryhill*, No. 3:17-CV-01310 (JCH), 2018 WL 2926284, at *2-7 (D. Conn. June 11, 2018)
(finding that the ALJ failed to follow the treating physician rule when, among other things, he
concluded that the opinion was inconsistent with the MSEs).

opinion when the record "largely reflect[ed] normal mental status examinations, including intact thought processes and minimal impairment in both judgment and insight"); *Worthy v. Berryhill,* No. 3:15-CV-1762 (SRU), 2017 WL 1138128, at *9 (D. Conn. Mar. 27, 2017) ("[The ALJ was entitled to consider the lack of evidence [in the treatment records] demonstrating severe mental limitations, such as marked difficulties with memory and concentration . . . ." (quotation marks omitted)); *Pagan v. Colvin*, 15 Civ. 3117 (HBP), 2016 WL 5468331, at *13 (S.D.N.Y. Sept, 29, 2016) ("[T]he ALJ provided good reasons for affording 'little weight' to [the treating psychiatrist's] opinion, namely that it was unsupported by [the treating psychiatrist's] own treatment notes, which showed that plaintiff had overall normal mental status examinations and there was general improvement in plaintiff's mood and anxiety over the course of treatment.").[6]

The Plaintiff also asserts that "it is irrational to rely on the opinion Chapdelaine wrote two weeks after he started treating [the Plaintiff] than the one he wrote twenty-six months later," especially since her mental status "went into crisis at the end of 2017." (Pl.'s Memo. of L., ECF No. 23-1, at 16-17.) However, the ALJ considered the Plaintiff's history of mental health problems in detail when determining her RFC, and reasonably concluded that her mental health improved over time. (R. 22-23.) First, he discussed her mental condition in March 2017. (R. 22.) During her initial appointment with a social worker, she was crying uncontrollably and presented as "agitated," "avoidant," "depressed and anxious," "labile," with tangential thought process and

---

[6]     In addition, LADC Chapdelaine is not a treating physician. Licensed clinical social workers are not "acceptable medical sources" and their opinions are therefore not entitled to deference under the treating physician rule. *See, e.g., Grega v. Saul*, 816 Fed. App'x 580, 583 (2d Cir. June 8, 2020) (summary order) (holding that a licensed clinical social worker is not an acceptable medical source under the regulations); *McQuillan v. Saul*, No. 3:19-CV-00191 (SRU), 2020 WL 1545778, at *11 (D. Conn. Apr. 1, 2020) ("[L]icensed clinical social workers, and therapists, among others, are considered 'other sources.' . . . . those opinions do not demand the same deference as those of a treating physician." (quotation marks and citations omitted)).

impaired insight and judgment.  (R. 22, 713-14.)  She was started on new medications, including Abilify, in May 2017.  (R. 730.)  At her next appointment, she reported that she did not notice any improvement in mood on the Abilify and she still had "tearfulness and anxiety."  (R. 732.) However, she presented as cooperative, orderly, and calm, with normal and goal directed thought process, "partial" insight, good judgment, and no evidence of cognitive issues.  (R. 733.)

The Plaintiff consistently attended therapy between July and November 2017.  She often had an anxious and depressed mood and was tearful at times; but she remained oriented, with normal motor activity, normal speech, "fair, inconsistent" impulse control, fair insight and judgment, and normal cognition.  (R. 22, 733, 736-37, 739-40, 743, 746, 748-49, 751-52, 755, 757-58, 761, 938-39, 941-42, 944-45, 947-48, 951, 953-54, 956, 959-60, 962-63, 966-67, 968.)  In August 2017, she reported that she had made progress in practicing mindfulness and improving her self-care  (R. 745-58), but she also had "continued mood lability, anger and irritability."  (R. 754.)  She was started on Trileptal for her irritability and anger (R. 756), and in September 2017, she reported that the Trileptal had a calming effect on her.  (R. 780.)  LADC Chapdelaine wrote that the "new medication appears to have been helpful" and the Plaintiff "reports less anxiety and a feeling of being able to respond to HUD in a good manner."  (R. 938.)  In October 2017, she reported that she had met a new male friend.  (R. 941, 947.)  On October 11, 2017, she presented as "depressed, tearful and angry" and reported "feeling disorganized and anxious and having a hard time functioning."  (R. 944.)  She was started on a new medication for depression (R. 946), and on October 24, 2017, she presented with an "improved mood and outlook" and said that the new medication had "helped a little bit."  (R. 947, 950.)  In November 2017, she reported that she was trying to walk and be more active, and she had started looking for part-time work.  (R. 953, 956, 962, 968.)

The ALJ then discussed the "crisis" that the Plaintiff went into at the end of 2017. (Pl.'s Memo. of L., ECF No. 23-1, at 22.) He noted that between November 2017 and March 2018, she was experiencing housing issues and facing eviction. (R. 22-23, 968-1006.) On December 19, 2017, she reported that her housing was "a mess" and she presented with a "sense of defeat." (R. 971.) Her mood was unbalanced and declining, she was easily distracted and "all over the place with [her] thoughts," and she cried often. (R. 971, 978, 982, 986, 990, 994.) In February 2018, she reported that she had some success with redirecting and distracting herself when anxious and said that she would focus on alternative work options. (R. 994, 1003.) In April 2018, she reported that her housing problems had been resolved. (R. 1007, 1011.) That same month, she had a physical examination, where she reported that the gabapentin helped her with her racing thoughts, denied depression, and stated that she felt her anxiety was "fair." (R. 1011.) Between April and September 2018, she continued to make "moderate progress." (R. 1020, 1023, 1026, 1040, 1562-63, 1566-67.) On September 19, 2018, she reported that she was going to try to go back to work. (R. 1566.) On October 6, 2018, she abruptly stopped her Effexor and gabapentin, presenting as "labile, tearful, and very disorganized." (R. 1570-72.) In November 2018, she reported that she was still off the medication and continued to have mood swings, but she was "motivated to address mental health concerns without medication." (R. 1578.) In January 2019, she reported that she was still off her psychiatric medications except for trazodone. (R. 1582.) Her MSE was largely normal and she was in a "good frame of mind." (R. 1583-84.) Overall, the record supports the ALJ's conclusion that the Plaintiff's condition improved since 2017, despite the fact that she "went into crisis" at the end of 2017.

The Plaintiff also argues that the ALJ was incorrect to discount LADC Chapdelaine's opinions on her medical issues, since "Chapdelaine has a better grasp of [the Plaintiff's] medical

conditions than the ALJ – who is also not a doctor." (Pl.'s Memo. of L., ECF No. 23-1, at 16.) However, the ALJ was permitted to weigh the value of the opinion based on the nature and scope of the treatment relationship. *See* § 416.920c(c)(3). It was not error for him to conclude that these findings were not persuasive. In addition, any error in failing to explicitly articulate the supportability and consistency of LADC Chapdelaine's opinions on the Plaintiff's medical issues was harmless. The medical parts of his opinions mostly state facts about the Plaintiff's medical history that are already in the record. (*See* R. 772, 1986, 1988, 1991.) The ALJ explicitly considered the impact of the Plaintiff's breast cancer, neck and back pain, and gastrointestinal issues elsewhere in the opinion. (*See* R. 17, 20-22, 26; *infra* Part IV.B.i & ii, IV.C.iii & iv.) *See also Walzer v. Chater,* No. 93 CIV. 6240 (LAK), 1995 WL 791963, at *9 (S.D.N.Y. Sept. 26, 1995) (finding harmless error when a report the ALJ failed to explicitly consider was generally consistent with other evidence that the ALJ did consider).

For the foregoing reasons, the Court concludes that the ALJ properly weighed the opinion evidence from LADC Chapdelaine. As required by the new regulations, the ALJ explained his findings regarding the supportability and consistency for each of the opinions, and pointed to specific evidence in the record supporting those findings.

### ii.    Susan Wiskowski, M.D.

Susan Wiskowski, M.D. from Collins Medical Associates/Blue Hills Family Medicine, identified as the Plaintiff's primary care physician (R. 813, 819), wrote an "Employment Services Medical Exemption Report" dated August 5, 2017. (R. 818-20.) She opined that the Plaintiff's chronic joint and muscle pain, history of breast cancer, depression, and "mental breakdown, crying, anger outbursts" prevent her from working indefinitely. (R. 818-19.) The ALJ found that her opinion was "not persuasive" because it was "not a functional assessment," it was "not supported by specific objective findings," and it was "inconsistent with the record as a whole."

(R. 25.)   The Plaintiff argues that an ALJ "cannot reject treating physician statements in the medical records just because there was no detailed function-by-function assessment . . . ." (Pl.'s Memo. of L., ECF No. 23-1, at 23.)  She cites to *Aurilio v. Berryhill*, 3:18-cv-00587 (MPS), 2019 WL 4438196, at *2 (D. Conn. Sept. 16, 2019), where the court held that  "the absence of a detailed functional assessment is not a 'good reason' to dismiss the portions of [the treating physician's] letter that do not address specific functional limitations . . . ."  However, as discussed above, the treating physician rule no longer applies and ALJs do not need to provide "good reasons" for rejecting the conclusions of a treating physician.

The ALJ was permitted to find Dr. Wiskowski's opinion less persuasive because of a lack of detail and internal support.  Dr. Wiskowski's opinion lacks *any* functional assessment, not just a detailed factual assessment.  The opinion lists the Plaintiff's impairments and some of her symptoms, provides information about their treatment relationship, states that her prognosis is "guarded," and opines that the Plaintiff's impairments prevent her from working indefinitely.  (R. 818-19.)  Her conclusion that the Plaintiff will be unable to work indefinitely goes to the ultimate finding of disability—and, therefore, is a conclusion that the ALJ was permitted to reject.  "[S]ome kinds of findings—including the ultimate finding of whether a claimant is disabled and cannot work—are reserved to the Commissioner."  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citation and quotation marks omitted).  *See also* 20 C.F.R. § 416.920b(c); *Wojtkowski v. Comm'r of Soc. Sec.,* No. 18-CV-0511 (MJR), 2019 WL 4051687, at *6 (W.D.N.Y. Aug. 28, 2019) (no error when the ALJ rejected the treating physician's opinion because it "lacked specificity in plaintiff's ability to perform work-related functions" and "spoke to the ultimate issue of disability"); *Cardoza v. Comm'r of Soc. Sec.*, 353 F. Supp. 3d 267, 277 (S.D.N.Y. 2019) ("[A]n ALJ need not defer to a treating source's opinion on the ultimate issue of disability.").  Without

the conclusion that the Plaintiff is disabled due to her impairments, Dr. Wiskowski's opinion is only a list of some of her conditions and symptoms.

Furthermore, the ALJ did not dismiss Dr. Wiskowski's opinion entirely because it lacked a function-by-function assessment.  He also concluded that the opinion was "inconsistent with the record as a whole."  (R. 25.)  He stated that the record "shows that the claimant's breast cancer was successfully treated, does not show significant joint or muscle pains, and does not show that the claimant exhibited angry outbursts."  (*Id*.)  He did not cite to specific portions of the record which supported his conclusions, but "[a]n ALJ does not have to state on the record every reason justifying a decision . . . . An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."  *Brault*, 683 F.3d at 448 (citation and quotation marks omitted). The ALJ noted elsewhere in the decision that the Plaintiff's breast cancer was successfully treated and is in remission (R. 17; *see also* R. 574, 2113), and that her physical examinations regularly showed normal musculoskeletal findings, despite her claims of back, neck, and hip pain.  (R. 21.) The record shows that the Plaintiff could be irritable and labile at times but does not show that she had a history of angry outbursts.  (*See, e.g.*, R. 684-688, 1990-91.)  The ALJ did not explicitly address Dr. Wiskowski's conclusion that the Plaintiff's "mental breakdown" and "crying" would interfere with her ability to work, but he addressed the Plaintiff's mental issues elsewhere in the decision.  (R. 22-26.)  He concluded that she has depression and anxiety which causes emotional lability and crying, but that those issues did not significantly limit her ability to work.  (*See* R. 26.) Therefore, the ALJ properly assessed Dr. Wiskowski's opinion as required by the new regulations. He discussed the supportability and consistency of her opinion and pointed to specific factual findings which supported his conclusions.

iii.        Monique Martin, M.D.

Dr. Monique Martin is one of the Plaintiff's primary care physicians and authored three opinions  (*See* Pl.'s Memo. of L., ECF No. 23-1, at 24-26):  the first on January 18, 2018 (R. 821-25); the second on May 25, 2018 (R. 1257-59); and the third on August 29, 2019.  (R. 2015-20.)[7] The ALJ concluded that Dr. Martin's "initial opinions" from January 2018 were not persuasive, since they were "not functional assessments and not supported by objective findings."  (R. 25.) He did not provide articulation of the May 2018 opinion, concluding that it was "inherently neither valuable nor persuasive . . . ."  (R. 26.)  He found that the August 2019 opinion was "not persuasive,"  since it was only partially supported, and the severe limitations assessed were inconsistent with the record as a whole.  (R. 25.)

The record shows that the ALJ properly considered Dr. Martin's January 2018 and August 2019 opinions in accordance with the regulations, discussing their supportability and consistency. He noted that the January 2018 opinion stated that she could not work "due to breast cancer, abdominal issues, depression, and anxiety."  (R. 25.)  He concluded that this opinion was not well-supported since it was not a functional assessment and it was not supported by objective findings. (*Id.*)  He then discussed the 2019 opinion, concluding it was only "partially supported"  by Dr. Martin's explanations and by objective evidence.  (*Id.*)  He explained that Dr. Martin partially supported her conclusions on the Plaintiff's mental capabilities by explaining that the Plaintiff has

---

[7]        The Plaintiff also implies that there was a report authored by Dr. Martin that is not in the record.  (Pl.'s Memo. of L., ECF No. 23-1, at 26.)  On June 6, 2019, Dr. Martin wrote in her treatment notes: "disability paperwork completed today-still continues with depression, anxiety, PTSD symptoms and various types of pain since surgery and treatment for breast cancer.  Very difficult to maintain steady employment due to chronic mental and physical conditions . . . ."  (R. 1861.)  The Plaintiff does not argue that this report would be material to her case, or that its contents diverged from the assessments in Dr. Martin's opinion from August 2019.  Even if there is a report from Dr. Martin that is not in the record, "[a]bsent any showing of prejudice, the ALJ did not fail to meet his burden of developing the record."  *Lena v. Astrue*, No. 3:10-CV-893 (SRU), 2012 WL 171305, at *9 (D. Conn. Jan. 20, 2012).

"anxiety that is exacerbated by her medical issues" and "limited motivation." (R. 25, 2016, 2019-2020.) However, she did not explain why the Plaintiff "had a significantly reduced ability to stand, walk, or lift" or why she would "require significant time off-task." (R. 25.)

The ALJ then concluded that the "more restrictive limitations" opined by Dr. Martin were not consistent with the record as a whole. (R. 25.) He pointed to specific parts of the record that were inconsistent with the severe limitations assessed by Dr. Martin. He acknowledged that the Plaintiff was documented as having degenerative disc disease and trapezius spasm, but noted that she had intact musculoskeletal and neurological findings with a normal gait. (*Id*.) He cited to Dr. Martin's treatment notes from May 2018 to June 2019, which consistently showed that the Plaintiff was "comfortably sitting with no pain," she had a normal gait, and her neurological and musculoskeletal findings were normal. (R. 1832, 1836-37, 1840-41, 1843-44, 1847-48, 1853-54, 1856-57, 1860-61, 1864-65.) Addressing the Plaintiff's gastrointestinal issues, the ALJ stated that she had some abdominal tenderness and distention, but that her constipation was managed with medication and physical exams regularly showed normal bowel sounds, no obstruction, and no guarding. (R. 25.) Though he did not specifically cite to the Dr. Martin's treatment notes, he did so when discussing the Plaintiff's history of treatment for gastrointestinal problems. (R. 22, 24.) Of note, even when the Plaintiff reported abdominal pain, she did not appear to be in distress, and the physical examinations showed only bloating and "mild suprapubic tenderness." (R. 1846-47, 1852-53.) Regarding the Plaintiff's mental health issues, the ALJ noted that she has periods of crying and tangential thoughts, but her MSEs often showed benign findings, and she has been able to maintain her activities of daily living. (R. 25.) As discussed *infra* Parts IV.B.iii & C.v, this

finding is supported by substantial evidence.  Therefore, the ALJ did not err in assessing Dr.
Martin's January 2018 and August 2019 opinions.

The ALJ did err when he failed to discuss the supportability and consistency of the May
2018 opinion.  He declined to "provide articulation" about Exhibit D24F, which contains Dr.
Martin's May 2018 opinion, since it was "neither valuable nor persuasive in accordance with 20
CFR 416.920b(c)."  (R. 26.)  This was error, even under the new regulations.  *See Charles F. v.
Commissioner*, No. 19-CV-1664 (LJV), 2021 WL 963585, at *2-3 (W.D.N.Y. Mar. 15, 2021)
(finding that it was error for the ALJ to dismiss an opinion for being "inherently neither valuable
nor persuasive" without explaining how he considered the supportability and consistency factors).
But though this was error, it was harmless.  An ALJ's failure to explicitly discuss an opinion from
a treating provider may be considered harmless when the contents of the report would not have
changed the outcome of the decision.  *Compare Arguinzoni v. Astrue,* No. 08-CV-6356T, 2009
WL 1765252, at *9 (W.D.N.Y. June 22, 2009) (holding that the ALJ's failure to identify the
amount of weight given to the opinion evidence was harmless error because "that consideration
would not have changed the outcome of the hearing determination") *with Charles F.,* 2021 WL
963585 at *3 (concluding that the ALJ's failure to acknowledge the medical opinion was not
harmless error because the opinion contradicted the ALJ's RFC determination); *Lewis v. Colvin*,
No. 1:14-CV-00794 (MAT), 2017 WL 2703656, at *2 (W.D.N.Y. June 23, 2017) ("[T]his error
was not harmless, because the limitations opined in [the physician's] opinion were quite restrictive
and could have resulted in a finding of disability—or at the very least a more restrictive RFC
finding—if given weight by the ALJ.").

There is nothing in Dr. Martin's May 2018 opinion which diverges from other medical
evidence or clearly contradicts the RFC.  In the opinion, Dr. Martin stated that the Plaintiff was

diagnosed with "depression, anxiety, PTSD," and "chronic abdominal pain" that she has suffered from since 2000. (R. 1257-58.) She wrote: "mental health disability preventing ability to work. Also persistent abdominal pain and complications since surgery." (R. 1258.) She opined that the Plaintiff was unable to work indefinitely and she had a "poor prognosis for employment." (R. 1258.) Dr. Martin's opinions about the Plaintiff's inability to work go to the ultimate issue of disability and, therefore, lack persuasive value. (*See supra* Part IV.A.ii.) The Plaintiff's depression, anxiety, PTSD, abdominal issues, and the impairments stemming from those conditions were better-documented elsewhere in the record—including in Dr. Martin's medical report from August 2019. (R. 2015-20.) Because there is no indication that the May 2018 opinion would have changed the outcome of the decision, the error was harmless.

### iv.      Amir Masoud, M.D.

Dr. Masoud is a gastroenterologist from Yale Gastroenterology and Gastrointestinal Motility who treated the Plaintiff's dysphagia, constipation, bloating, and other digestive issues. (R. 569-70, 603-605, 671, 777-80, 784-86, 1057-59.) In Exhibit D8F, there is a "Physical Medical Source Statement" that does not include a signature page, but which has Dr. Masoud's name, number, and address written on the first page. (R. 697-99.)[8] The ALJ declined to "provide

---

[8]      Dr. Masoud's opinion may be incomplete. It does not contain a date or a signature page. On the second page, which asks for an assessment of the Plaintiff's functional limitations, Dr. Masoud crossed it off and wrote "N/A." (R. 698.) There is another copy of the same form in Exhibit D8F—apparently filled out and signed by the Plaintiff—which shows that the "Physical Medical Source Statement" form is four pages long. (R. 701-704.) In a footnote, the Plaintiff writes that the ALJ did not "bother to get a complete copy" of the opinion. (Pl.'s Memo. of L., ECF No. 23-1, at 27 n.5.) She implies that the ALJ failed to develop the record when he did not seek out a full copy of the form. The Court declines to address this issue, however, as the argument is relegated to a footnote. "Courts in this circuit have made clear that arguments in footnotes are waived." *Skibniewski v. Comm'r of Soc. Sec.*, No. 19-CV-00506, 2020 WL 5425343, at *3 n.1 (W.D.N.Y. Sept. 10, 2020) (collecting cases). *See also Marnell v. Comm'r of Soc. Sec.*, No. 17-CV-6201P, 2018 WL 3620152, at *10 n.6 (W.D.N.Y. July 30, 2018) (declining to address the plaintiff's challenge to the ALJ's RFC determination when the argument was relegated to

articulation" concerning the contents of Exhibit D8F, including Dr. Masoud's opinion, since it was "neither valuable nor persuasive" in accordance with § 416.920b(c).  (R. 26.)  As with Dr. Martin's opinion, it was error for the ALJ to dismiss Dr. Masoud's opinion without assessing its supportability and consistency, but the error was harmless.  (*See supra* Part IV.A.iii.)  There is nothing in the opinion which diverges from other medical evidence or contradicts the RFC.  Dr. Masoud's opinion did not include any functional assessments—in fact, the section where he was asked to assess the Plaintiff's functional limitations was crossed off and he wrote "N/A."  (R. 698.) He listed the Plaintiff's medical conditions and his clinical findings, and he wrote that the Plaintiff's anxiety contributed to her impairments.  (R. 697.)  All of these facts were contained in the treatment notes and in other opinion evidence, and the ALJ discussed the Plaintiff's bloating, esophageal spasms, dysphagia, and abdominal pain at length.  (R. 21-22.)  Dr. Martin also opined that the Plaintiff's anxiety exacerbates her condition (R. 2016), an opinion which the ALJ considered when formulating the RFC.  (R. 25.)  Therefore, the ALJ's failure to consider Dr. Masoud's opinion pursuant to the regulations was not reversible error.

**B.    The ALJ Properly Considered the Severity of the Plaintiff's Impairments at Step Three**

At Step Three of the sequential evaluation process, the ALJ evaluates whether the claimant's impairments meet or equal the criteria of any listed impairments.  20 C.F.R. § 404.1520(a)(4)(iii) states: "At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled."  A disability determination at Step Three mandates that a claimant satisfy *each and every* requirement

---

footnotes).  In any event, the Plaintiff has "made no showing that the missing pages are material or that their absence undermined the result."  *Lena,* 2012 WL 171305, at *9.

of a listed disability. *Bolden v. Comm'r of Soc. Sec.*, 556 F. Supp. 2d 152, 162 (E.D.N.Y. 2007) ("In order for a condition to be considered disabling *per se* under step three, it must satisfy each element set out in the definition of a listed impairment." (citing *Sullivan v. Zebley,* 493 U.S. 521, 531 (1990)).

In this case, the ALJ determined that none of the Plaintiff's impairments, either individually or in combination, met one of the listed impairments in the regulations. Specifically, the ALJ determined that the Plaintiff did not meet the listing for 1.04, "disorders of the spine"; 5.06, "inflammatory bowel disease (IBD)"; 12.04, "depressive, bipolar and related disorders"; or 12.06, "anxiety and obsessive-compulsive disorders." (R. 17-19.) The Plaintiff argues that the ALJ erred in his assessment of the severity of her impairments at this step. (Pl.'s Memo. of L., ECF No. 23-1, at 7.) She does not specify which of these listings she meets or argue that she meets any other listing.

### i.       Listing 1.04, "Disorders of the Spine"

To meet this listing, the plaintiff's spinal disorder must "result in compromise of a nerve root (including the cauda equina) or the spinal cord" with additional findings of: "A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test"; "B. Spinal arachnoiditis"; or "C. Lumbar spinal stenosis resulting in pseudoclaudication . . . ." 20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 1.04. The ALJ concluded that the Plaintiff did not meet this listing because the record did not demonstrate that she met any of these criteria. (R. 17-18.) This finding is supported by substantial evidence.

The ALJ cited to the results of scans of the Plaintiff's cervical spine, thoracic spine, and lumbosacral spine, which indicated that she had loss of normal cervical lordosis and mild thoracolumbar spondylosis. (R. 18, 1277, 1512.) He also cited to treatment notes from Dr. Martin

from between May 2018 and July 2019, which generally showed normal neurological and musculoskeletal findings during physical examinations.  (R. 18, 1832, 1837, 1841, 1844, 1847, 1854, 1857, 1861, 1864, 1868.)  The Plaintiff once complained of back pain in her lumbosacral midline, but her neurological and musculoskeletal exams were normal.  (R. 1856-57.)  None of the Plaintiff's treatment providers indicated that her nerve roots were compromised, and no physician diagnosed her with spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication.[9] "The burden of proof is on [the plaintiff] to present evidence that she satisfies all of the Listing requirements . . . clinical findings failed to support a determination that [the plaintiff's] impairment met or medically equaled the requirements of the Listing for disorders of the spine because [the physician] failed to document any evidence of nerve root compression, arachnoiditis or spinal stenosis resulting in pseudoclaudication."  *Stopa v. Berryhill*, No. 3:17-CV-00934 (SRU), 2018 WL 4521938, at *8 (D. Conn. Sept. 21, 2018).  Therefore, the ALJ did not err in concluding that the Plaintiff did not meet this listing.

ii.       **Listing 5.06, "Inflammatory Bowel Disease (IBD)"**

To meet this listing, the plaintiff must show "[o]bstruction of stenotic areas (not adhesions) in the small intestine or colon with proximal dilatation . . . requiring hospitalization for intestinal decompression or for surgery, and occurring on at least two occasions at least 60 days apart within a consecutive 6-month period."  20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 5.06(A).  Alternatively, two of six listed criteria in subsection B must occur in the same consecutive six-month period, despite continuing treatment.  *Id.* at § 5.06(B).  These criteria are: "[a]nemia with hemoglobin of less than 10.0 g/dL"; "[s]erum albumin of 3.0 g/dL or less"; "[c]linically documented tender

---

[9]       In 2019, the Plaintiff was diagnosed with "chronic bilateral low back pain, with sciatica presence unspecified" and "cervicalgia."  (R. 1940.) On examination, she had an impaired cervical and lumbar range of motion and reduced sensation in her right upper extremity (R. 1934), but her straight-leg raising tests were both negative.  (R. 1935.)

abdominal mass palpable on physical examination with abdominal pain or cramping that is not completely controlled by prescribed narcotic medication"; "[p]erineal disease with a draining abscess or fistula"; "[i]nvoluntary weight loss of at least 10 percent from baseline, as computed in pounds, kilograms, or BMI"; and "[n]eed for supplemental daily enteral nutrition via a gastrostomy or daily parenteral nutrition via a central venous catheter." *Id.* at § 5.06(B)(1)-(6).  To be met, criteria 1-5 must be present "on at least two evaluations at least 60 days apart." *Id.*

There is no evidence in the record that the Plaintiff received or needed intestinal decompression or surgery as a result of obstruction of stenotic areas.  The record shows that she had her distal esophagus dilated on October 11, 2016. (R. 584-85.)  She went to the ER with post-procedure pain and dysphagia on October 14, 2016 and was discharged on October 17, 2016.  (R. 595.)  She had an esophagram while at the hospital, but it does not appear as though she had surgery.  (*Id.*)  At some point, she had an exploratory laparoscopy "for adhesions versus rule out bowel obstruction" and the surgeon commented that her small bowel looked "very smooth."  (R. 1634.)  An abdominal x-ray was done on April 18, 2018, which showed that there was a "nonobstructive bowel gas pattern without evidence of dilated loops of bowel."  (R. 847.)  On November 23, 2018, a fluoroscopy of her upper GI tract and small bowel showed a normal small bowel.  (R. 1819-20.)  A colonoscopy performed on October 7, 2019 showed diverticulosis of the sigmoid colon, but the examination was otherwise normal.  (R. 2160.)

The record also did not show that the Plaintiff experienced two of the six listed criteria within the same six-month period.  Her providers occasionally noted that she had anemia or a history of anemia (R. 706, 1132, 1199, 1587, 2015), but the record does not contain test results which show a hemoglobin level of less than 10.0 g/dL.  (R. 584, 1132, 1663.)  When her albumin level has been documented, it has not been below 3.0 g/dL.  (R. 584, 1133, 1666.)  Multiple

providers found that her abdomen was either normal or distended due to constipation and reported

no masses on physical examination.  (R. 557, 562, 565, 570, 589, 605, 673, 707, 779, 786, 800,

831, 1055, 1155, 1162, 1167, 1169, 1206, 1624, 1627, 1635, 1837, 1847, 1886, 1900, 1970, 2117.)

Dr. Martin once reported that there was a "hard lump in the abdomen," possibly a hernia (R. 1864),

and the Plaintiff complained of cramping.  (R. 1863.)  However, the Plaintiff denied abdominal

pain and did not appear to be prescribed any narcotic pain medication for the issue.  (*Id.*)  There

was no indication in the record that she had perineal disease, a draining abscess, a fistula, or a need

for supplemental daily enteral nutrition.  (*See* R. 1634.)

The Plaintiff did report significant involuntary weight loss of at least ten percent from

baseline in August and October 2016.  On August 16, 2016, she reported involuntary weight loss

of "about 30 lbs over the past six months."  (R. 610.)  On February 1, 2016, her weight was 153

pounds (R. 1293), and on August 15, 2016, her weight was 128 pounds.  (R. 611.)  On October

14, 2016, her weight was 117 pounds, and she reported that the weight loss was involuntary.  (R.

572-74, 578, 580.)  Since October 2016, it appears as though she has experienced no further

involuntary weight loss.  She denied unintended weight loss several times (R. 671, 777, 1634), and

she regained and maintained some of the weight she had lost.  (R. 1201, 1587, 1743, 2116, 2184.)

In July 2019, she reported weight loss, but no more than seven pounds over the past year.  (R.

2003.)  In addition, as discussed above, the record did not show that she met at least one of the

other criteria in the same six-month period.  Therefore, the Plaintiff has failed to show that she

meets the requirements of this listing.

### iii.      Listings 12.04, "Depressive, Bipolar, and Related Disorders" and 12.06, "Anxiety and Obsessive-Compulsive Disorders"

To meet either of these listings, the plaintiff must the satisfy the requirements of paragraph

A and paragraph B OR paragraph A and paragraph C.  20 C.F.R. § Pt. 404, Subpt. P, App'x 1, §§

12.04, 12.06.  To meet the paragraph B criteria, the claimant must show extreme limitation[10] of one, or marked limitation[11] of two, of the defined areas of mental functioning: "1. Understand, remember, or apply information (see 12.00E1). 2. Interact with others (see 12.00E2).  3. Concentrate, persist, or maintain pace (see 12.00E3). 4. Adapt or manage oneself (see 12.00E4)." *Id.*  The ALJ found that the Plaintiff had "mild limitation"[12] in understanding, remembering, or applying information; "moderate limitation"[13] in interacting with others; "moderate limitation" in concentrating, persisting, or maintaining pace; and "mild limitation" in adapting or managing oneself.  (R. 18-19.)  Based on these findings, the ALJ concluded that the Plaintiff did not meet the paragraph B criteria.  (*Id.*)  With respect to the paragraph C criteria,[14] the ALJ found that there was no evidence of a "serious and persistent" mental disorder with evidence of "marginal adjustment such that the claimant has a minimal capacity to adapt to changes in her environment . . . ."  (R. 19.)  He noted that the Plaintiff has retained the capacity to "care for her personal needs, cook, clean, grocery shop, and drive."  (R. 19.)

The Plaintiff argues that the ALJ erred in assessing "only slight functional limitations" for her mental disorders, since her ability to do activities of daily living does not mean she can work.

---

[10]     An "extreme limitation" means the plaintiff is "not able to function in this area independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 12.00F2.

[11]     A "marked limitation" means the plaintiff's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited."  *Id.*

[12]     A "mild limitation" means that the plaintiff's "functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited."  *Id.*

[13]     A "moderate limitation" means that the plaintiff's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair."  *Id.*

[14]     To meet the paragraph C criteria, the plaintiff's "mental disorder must be 'serious and persistent,'" which means that there must be "a medically documented history of the existence of the disorder over a period of at least 2 years," as well as evidence of both "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing" and "[m]arginal adjustment."  20 C.F.R. § Pt. 404, Subpt. P, App'x 1, §§ 12.04(C), 12.06(C).

(Pl.'s Memo. of L, ECF No. 23-1, at 7.)  She specifically challenges his conclusion that she has a mild limitation in adapting or managing herself, stating that her "life is in shambles" and that, in any event, her ability to perform basic household chores does not support a finding that she can sustain full-time work.  (*Id.* at 7-8.)  For the reasons discussed further below, the Court finds that the ALJ's conclusions about the Plaintiff's limitations in mental functioning are supported by substantial evidence.  Because the Plaintiff did not have an "extreme" limitation or two "marked" limitations of the four areas of mental functioning, and she has more than a minimal capacity to adapt to the requirements of daily life, the ALJ did not err in concluding that she does not meet listing 12.04 or 12.06.

        1.      Understanding, Remembering, or Applying Information

The ALJ's conclusion that the Plaintiff had a "mild limitation" in understanding, remembering, or applying information is supported by substantial evidence.  Her MSEs showed her as being "mostly alert, oriented, has average intelligence, partial fund of knowledge, fair insight, fair judgment, normal cognition, and normal speech."  (R. 729-30, 733, 737, 740, 743, 746, 748-49, 751-52, 755-56, 757, 761, 936, 938-39, 941-42, 945, 947, 951, 953, 956-57, 959-60, 962, 966, 968, 971, 975, 978-79, 982, 986, 990, 994, 998-99, 1003-1004, 1007, 1012-13, 1015, 1019, 1023, 1026, 1030, 1033, 1037, 1040, 1562, 1566, 1571-72.)  LADC Chapdelaine opined in 2017 that she only had "reduced" abilities in carrying out single-step instructions and changing from one simple task to another (R. 687), Dr. Martin opined that she was "not significantly limited" in her memory and understanding (R. 2019), and both the state agency psychological consultants

opined that her cognition was intact and she had a mild limitation in her understanding, remembering, and applying information.  (R. 179, 198.)

       2.    <u>Interacting with Others</u>

The ALJ's conclusion that the Plaintiff had a "moderate limitation" in interacting with others is supported by substantial evidence.  The record shows that she had some irritability, anger, and lability, and often cried during her appointments.  (R. 713-714, 717-18, 726, 736, 739, 742, 754, 944, 971, 978, 982, 986, 990, 1030, 1033, 1040, 1575-76, 1578-79.)  However, she remained cooperative, engaged, and receptive with her mental health providers.  (R. 718, 729, 733, 739, 742, 745, 748, 751, 755, 761, 936, 938, 945, 947, 951, 953, 959, 962, 966, 975, 982, 986, 1003, 1007, 1012, 1015, 1019, 1023, 1026, 1033, 1037, 1040, 1562, 1566, 1571, 1575, 1579, 1583.)  She often presented with normal speech, normal or calm psychomotor activity, and appropriate eye contact.  (R. 729, 733, 736-37, 739, 743, 746, 748-49, 751, 755, 757, 936, 938, 941, 945, 947, 951, 953, 956, 962, 966, 968, 975, 978, 982, 986, 990, 994, 998, 1003, 1007, 1012-13, 1015, 1019, 1023, 1026, 1030, 1033, 1037, 1040, 1562, 1566, 1571-72, 1583.)   In 2017, LADC Chapdelaine explained that she had mood dysregulation, but she was committed to the therapy process, her appearance was normal, and her speech was "normal, at times rapid."  (R. 684-85.)  He concluded that she had an average ability to interact with others and respond appropriately to authority, and only reduced ability to ask questions, request assistance, or get along with others without distracting them or exhibiting behavioral extremes.  (R. 687.)   His 2019 opinion was more restrictive, but he still opined that she was only "moderately" limited in all areas of social interaction.  (R. 1994.)  Dr. Martin also opined that the Plaintiff was "moderately" limited in most areas of social interaction, though she did check that the Plaintiff had "no limitation" in her ability to ask simple questions and request assistance.  (R. 2019.)  In addition, the Plaintiff testified during

her hearing that she is "really to [herself]," but she can go grocery shopping with her children and occasionally has social outings with friends.  (R. 51, 64-65.)

       3.     <u>Concentrating, Persisting, or Maintaining Pace</u>

The ALJ's conclusion that the Plaintiff had a "moderate limitation" in concentrating, persisting, and maintaining pace is supported by substantial evidence.  Though LADC Chapdelaine opined in 2019 that the Plaintiff is "markedly impaired" in this area (R. 1994), which she emphasized in her brief (Pl.'s Memo. of L., ECF No. 23-1, at 15),  there was enough evidence in the record for the ALJ to reach the conclusion that her limitation was moderate.  Her treatment notes showed that sometimes her thought process was tangential or preservative (R. 714, 718, 721, 724), she was distractable or unable to focus (R. 714, 718, 721, 724, 730, 982), or her mood was labile and dysregulated.  (R. 724, 754, 986, 990.)  However, the ALJ noted that her providers more often observed that she was alert and oriented, with normal thought process, goal-directed thoughts, and there was no evidence of cognitive issues.  (R. 733, 737, 740, 743, 746, 749, 751-52, 755, 757-58, 761, 936, 938-39, 941-42, 945, 947, 951, 953, 956-57, 959-60, 962, 966, 968, 971, 975, 978-79, 982, 986, 990, 994, 999, 1003-1004, 1007, 1012-13, 1015, 1019, 1023, 1026, 1030, 1033, 1037, 1040.)

Additionally, LADC Chapdelaine opined in 2017 that, despite her mood dysregulation and her becoming distracted easily (R. 684-85), she only had a "reduced" ability to focus long enough to finish simple activities or tasks, change from one task to another, and persist in simple activities without interruption from psychological symptoms.  (R. 687.)  She also had an average ability to perform basic activities at a reasonable pace.  (*Id.*)  Dr. Martin opined that the Plaintiff was "not significantly limited" in maintaining attention and concentration for extended periods of time, and "moderately limited" in performing activities within a schedule, maintaining regular attention, sustaining an ordinary routine without special supervision, and working in coordination or

proximity to others without being distracted by them.  (R. 2019.)  Dr. Leib, a state agency consultant at the initial level, concluded that she had a moderate limitation in concentration, persisting, and maintaining pace, explaining that she has documented problems with distractibility and focus.  (R. 179.)  In addition, she can perform daily tasks that require concentration, persistence, and pace, such as household chores, shopping, and driving (R. 19), and she was able to look for work and obtain temporary employment during the relevant time period.  (R. 19, 713, 953, 962, 1003, 1562, 1566.)

    4.    Adapting or Managing Oneself

    The ALJ's conclusion that the Plaintiff has more than minimal capacity to adapt to changes, and only has a "mild limitation" in adapting or managing herself, is supported by substantial evidence.  Her mental health providers observed, after she was treated with therapy and psychiatric medications, that she had had fair insight, judgment, and impulse control, though her insight was sometimes referred to as "partial" and her impulse control was often observed to be fair, but "inconsistent."  (R. 19, 25, 733, 737, 746, 749, 752, 755-57, 761, 988-89, 941-42, 945, 947-48, 951, 956-57, 962, 966, 968, 971-72, 975-76, 978-79, 982, 986, 990, 994, 999, 1004, 1007, 1013, 1015, 1019, 1023, 1026, 1030, 1033, 1037, 1040.)  In September 2018, LADC Chapdelaine noted that she had a neat appearance, her mood had improved, and her judgment was "fair to good, improving."  (R. 1562, 1566.)  LADC Chapdelaine wrote in his 2017 opinion that she was better than average at taking care of her personal hygiene and average at caring for her physical needs, though she had a reduced ability to use good judgment and a limited ability to use appropriate coping skills and handle frustration appropriately. (R. 686.)  Dr. Martin opined in 2019 that the Plaintiff was "not significantly limited" in responding appropriately to changes in work setting and traveling to unfamiliar places, and had no limitation in being aware of hazards and taking

appropriate precautions.  (R. 2020.)  Both state agency consultants agreed that she only had a mild limitation in adapting or managing herself.  (R. 179, 198.)

The ALJ also noted, both at Step Three and elsewhere in the opinion,[15] that the Plaintiff's ability to adapt was only mildly limited because she was able to care for her personal needs, cook for her children, clean, grocery shop, and drive.  (R. 19, 24, 26.)  The Plaintiff correctly points out that the ability to perform basic household activities does not necessarily contradict a finding of disability (Pl.'s Memo. of L., ECF No. 23-1, at 8), since "claimants should not be penalized for enduring the pain of their disability in order to care for themselves."  *Woodford v. Apfel*, 93 F.Supp.2d 521, 529 (S.D.N.Y. 2000) (quotation marks and citation omitted).  However, her ability to manage her household by cooking, cleaning, and shopping is relevant to her overall ability to adapt and manage herself, and the ALJ was permitted to consider her daily activities when reaching a conclusion.  As discussed above, the ALJ's conclusion was not based on her daily activities alone—it was also based on treatment notes and opinion evidence in the record.

The Plaintiff asserts that her ability to adapt or manage herself is much more limited than the ALJ determined, since her "life is in shambles, she was under eviction (clearly not adequately providing for her own shelter or that of her children), her lights were about to be turned off, she charged her phone three times in a period of 2 months, and she was missing or failing to schedule doctor's appointments."  (Pl.'s Memo. of L., ECF No. 23-1, at 7-8.)  Generally, "[s]ituational stressors are not a basis for a finding of disability . . . ."  *Taillon v. Comm'r of Soc. Sec.*, No. 17-CV-6812, 2019 WL 1396837, at \*4 (W.D.N.Y. Mar. 28, 2019).  In addition, though she has had

---

[15]     "An ALJ's unexplained conclusion [at Step Three] of the analysis may be upheld where other portions of the decision and other 'clearly credible evidence' demonstrate that the conclusion is supported by substantial evidence."  *Ryan v. Astrue*, 5 F.Supp.3d 493, 507 (S.D.N.Y. 2014) (citation omitted).

personal stressors which seemed to exacerbate her anxiety and depression, it appears as though she was able to work through those problems.  On March 8, 2016, she told her doctor that she was afraid that her lights would be turned off (R. 1167), but she did not bring up the issue at her follow-up appointment a week later.  (R. 1165-66.)  She was facing eviction between November 2017 and March 2018.  (R. 968-1007.)  In January 2018, she explained to LADC Chapdelaine that she was facing eviction because she had not paid a bill she owed to housing, but that she was making an effort to fight the eviction and "she [had] an organization that [would] pay the old bill."  (R. 986.)  They discussed the issue and she agreed that she would reach out to agencies to create a plan of repayment.  (*Id*.)  Her housing was reinstated in March 2018, with an upgrade for her family that she was pleased with, and there were no further issues with her housing documented in the record.  (R. 1007, 1011.)

The Plaintiff's having navigated life stressors while caring for her children as a single mother (R. 713, 1167), and looking for work or working part-time (R. 713, 953, 962, 1003, 1167), actually speaks well of her ability to adapt and manage herself.  "[C]ourts have held that if one is able to satisfactorily navigate activities such as living on one's own, taking care of children without help . . . paying bills, and avoiding eviction, one does not suffer from deficits in adaptive functioning."  *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012) (quotation marks and alterations omitted).  Therefore, the ALJ did not err in determining that she only had a mild limitation in adapting or managing herself.

### C.    The ALJ Did Not Fail to Formulate an Accurate RFC Supported by Substantial Evidence in the Record

The Plaintiff argues that the ALJ failed to accurately calculate her RFC for several reasons.  First, she states that the RFC is "far less restrictive" than the RFC that was assessed in her previous Social Security claim from 2016, and questions why the RFC in the current case is less restrictive

when the agency consultant at the initial level opined that there were "no interval changes since [2016] ALJ denial."  (Pl.'s Memo. of L., ECF No. 23-1, at 12; *see also* R. 182.)  The Court interprets this as a *res judicata* argument.  Second, she asserts that the ALJ's "decision is not supported by substantial evidence because the ALJ rejected the opinions of all treating sources."  (Pl.'s Memo. of L., ECF No. 23-1, at 28.)  Third, she argues that the RFC is not an accurate reflection of her maximum capacity because the ALJ did not sufficiently accommodate for her severe impairments of "irritable bowel syndrome and esophageal spasm . . . [her] mental limitations . . . her back and neck problems," or her non-severe "shoulder, hand, and asthma conditions."  (*Id.* at 2-3.)  The Court will address each of these arguments in turn.

     **i.**     **The ALJ Was Not Bound by the Previous RFC Determination**

     There are three previous ALJ decisions in the record.  The most recent, dated August 25, 2016, contains slightly more limited RFC findings.  (R. 144, 153.)  As the Second Circuit has pointed out, a previous finding in a Social Security case is not itself evidence of disability, "but, rather, a conclusion based on evidence." *Caron v. Colvin*, 600 F. App'x 43, 44 (2d Cir. 2015) (summary order).  "[T]he fact that two ALJs may permissibly reach different conclusions, even on the same record . . . is not probative of anything."  *Id.*  In some circumstances, however, the findings of a previous ALJ can be binding.  "*Res judicata* has been applied to bind a subsequent ALJ to the findings of a previous ALJ.  'Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ.'" *Wessel v. Colvin*, No. 3:14-CV-00184 (AVC), 2015 WL 12712297, at *4 (D. Conn. Dec. 30, 2015) (quoting *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 840 (6th Cir. 1997)).  However, the previous ALJ's findings are not binding when there is no temporal overlap between the applications for benefits.  "When a plaintiff's claim involves a different unadjudicated time period, an ALJ is not bound by a prior ALJ's findings.  In cases where the ALJ was bound by the findings of a previous ALJ, the second

ALJ reevaluated evidence already presented and adjudicated by the first ALJ." *Wessel*, 2015 WL 12712297, at *5 (internal quotation marks omitted).

The most recent of the Plaintiff's previous claims became final on August 25, 2016. *Res judicata* would prevent the ALJ from reevaluating RFC findings from on or before that date. The ALJ did not make any findings about the Plaintiff's RFC on or before August 25, 2016—instead, he determined her RFC between May 11, 2017 (the day the application was filed) and December 2, 2019 (the date of the decision). (R. 11, 15.) This was an independent evaluation of a different application. Therefore, the 2016 RFC findings are not binding on the ALJ in the current case, regardless of the agency consultant's statements.

### ii.    The RFC Was Supported by Opinion Evidence

The Plaintiff argues that "[t]he decision is not supported by substantial evidence because the ALJ rejected the opinions of all treating sources." (Pl.'s Memo. of L., ECF No. 23-1, at 28.) "It is well established that an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Kurlan v. Berryhill*, No. 3:18-CV-00062 (MPS), 2019 WL 978817, at *1 (D. Conn. Feb. 28, 2019) (internal quotation marks and citation omitted). Here, the ALJ did not wholly reject the opinions of the Plaintiff's treating providers—in fact, the RFC incorporates some of the limitations that they assessed. For example, Dr. Martin opined that the Plaintiff could only occasionally "stoop/bend, crouch/squat, twist, [or] climb stairs," (R. 2017), and the ALJ incorporated those limitations into the RFC. (R. 19-20.) Another example is that LADC Chapdelaine opined that the Plaintiff had moderate limitations in all areas of social interaction (R. 1994), and the ALJ implicitly accommodated for these limitations by limiting her to only occasional contact with the public. (*See infra* Part IV.C.v.) "An ALJ does not necessarily 'reject' opinion evidence when the opinion is assessed less than controlling weight and where, as here, it

is evident that the ALJ's RFC determination incorporates limitations contained in that opinion." *Beckles v. Comm'r of Soc. Sec.*, No. 18-CV-321P, 2019 WL 4140936, at *4 (W.D.N.Y. Aug. 30, 2019) (collecting cases). In this case, the ALJ's RFC is not perfectly consistent with any of the opinions of the Plaintiff's treating providers, but that does not mean that the ALJ improperly substituted his own opinion for that of a physician. "Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order).

Additionally, it is not *per se* error for an ALJ to make an RFC determination without a medical opinion. The Second Circuit has held that where "the record contains sufficient evidence from which an ALJ can assess the claimant's [RFC], . . . a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (summary order) (internal quotation marks and citations omitted); *see also Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order) ("[R]emand is not always required when an ALJ fails in his duty to request opinions, particularly where, as here, the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity."). Here, the ALJ had opinions from the Plaintiff's treating providers; over 1,500 pages of medical records, including treatment notes, test results, and evaluations (R. 519-2200); the Plaintiff's testimony about her activities of daily living; and the assessments of the state agency consultants at both the initial and reconsideration levels.[16] Therefore, the ALJ's RFC

---

[16] "The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record." *Frye ex rel. A.O.,* 485 F. App'x at 487. *See also Baszto v. Astrue*, 700 F. Supp.2d 242, 249 (N.D.N.Y. 2010) ("It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State

determination is supported by substantial evidence, since it was supported by the opinions of the Plaintiff's treating providers and by other evidence in the record.

### iii. The ALJ Did Not Fail to Incorporate Limitations for the Plaintiff's Back and Neck Problems

The Plaintiff does not explicitly challenge the RFC with regards to her back and neck problems. She simply states that that the "[e]xertional and postural restrictions represent a nod to [her] low back and neck problems" and that the assessed limitations are "very meager." (Pl.'s Memo. of L., ECF No. 23-1, at 2-3.) She testified during her hearing that she has neck and back pain which causes various issues with her ability to function. (*See* R. 47-50.). She claimed that she has trouble leaning her head forward, she lacks balance, she cannot sit for prolonged periods, she cannot stand for 30 minutes, and she cannot not walk a mile. (R. 20, 47-50.) These claimed limitations are not accounted for in the RFC, and the full range of light work requires, among other things, "standing or walking, off and on, for a total of approximately 6 hours of an 8–hour workday." S.S.R. 83-10, 1983 WL 31251 (1983).

The records from before the relevant time period show that the Plaintiff often complained of neck pain and back pain, which is consistent with her hearing testimony. On May 18, 2015, Hartford Hospital took x-rays of her cervical spine, which showed "loss of normal cervical lordosis" and a "well-corticated osseous fragment." (R. 1277.) In March 2016, she complained of lower back and right hip pain and was sent for x-rays. (R. 1165.) X-rays of her thoracic and lumbosacral spine showed "mild thoracolumbar spondylosis." (R. 1512.) She followed up in April 2016 and discussed her lower back pain and hip pain, "which based on xrays show mild degenerative [disease]." (R. 1164.) She also stated that she had a history of cervical herniated

---

agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability.").

disc and chronic neck pain, related to a motor vehicle accident the year before.  (*Id*.)  In April 2016, she had a physical therapy evaluation, where she complained of pain in her right hip, knee, and lumbar spine.  (R. 1457-58.)  She reported a "long history of lumbar pain with multiple traumas" and a "disc herniation in the lumbar and cervical area."  (R. 1457.)  She attended physical therapy and was demonstrating improved gait, with no decreased pain, but her physical therapy was discontinued in November 2016 due to her non-compliance with therapy.  (R. 1470.)

The ALJ found that the "more current record" did not document significant ongoing treatment for the Plaintiff's back and neck pain.  He noted that she had not sought further treatment and that her physical examinations were generally normal.  (R. 25.)  This conclusion is supported by substantial evidence in the record.  Between 2015 and 2019, multiple treating providers physically examined the Plaintiff and found that her neck and musculoskeletal systems were normal.  (R. 800, 893, 1117, 1659, 1832, 1837, 1840-41, 1847, 1853-54, 1861, 1864, 1887, 1900, 1978, 1983.)  Dr. Martin noted several times, between May 2018 and June 2019, that the Plaintiff was comfortably sitting without pain, her gait was normal, and she was not in any distress.  (R. 1832, 1837, 1840-41, 1847, 1853-54, 1861, 1864.)  Occasionally, the Plaintiff told her treating providers that she did not have back and/or neck pain.  (R. 1836, 1839, 1843, 1846, 1852, 1860, 1885, 1982, 1977.)

On June 20, 2019, the Plaintiff went to Hartford Healthcare for a Physical Therapy Initial Evaluation, complaining of pain in her neck that radiated into her right arm and pain in her lower back that radiated into her right leg.  (R. 1933.)  She reported that she had multiple herniated discs in her neck and lower back.  (R. 1932.)  She was unable to sit for more than five minutes without experiencing neck and back pain.  (*Id.*)  A physical examination showed that the Plaintiff had a limited and painful cervical and lumbar range of motion and an abnormal gait.  (R. 1932-36.)

However, on that same day, the Plaintiff went to an appointment with Dr. Martin, who reported that the Plaintiff was "comfortably sitting without pain," her neck was supple with no deformity, her neurological and musculoskeletal systems were normal, and she had normal gait and posture. (R. 1864.)  The Plaintiff attended four physical therapy appointments at Hartford Healthcare.  (R. 1946, 1944, 1948, 1952-53.)  The physical therapist wrote that she continued to have muscle guarding, but she responded well to the exercises.  (R. 1953.)  She was discharged on September 19, 2019 for failing to schedule additional appointments.  (R. 2147.)

The ALJ noted that on July 31, 2019, the Plaintiff went to Hartford HealthCare Medical Group for an evaluation of hyperparathyroidism, and reported that she had been "seen at Kathy's Urgent Care on 06/20/2019 for a follow-up of herniated disc after being in a major car accident last Sunday."  (R. 2002.)  The record shows that the Plaintiff went to see Dr. Martin at Kathy's Urgent Care on June 20, 2019 for a follow-up, but she did not complain of back pain or report that she had been in a car accident. (R. 1862-64.)  Dr. Martin noted that the Plaintiff was not in distress, was comfortably sitting without pain, and her neurological and musculoskeletal exams were normal.  (R. 1864.)  During her July 31, 2019 visit at Hartford Healthcare, the Plaintiff reported problems with her gait and neck pain.  (R. 2005.)  The physical examination was generally normal—her neck was supple, her neurological findings were normal with her sensation intact, her muscle tone was normal, and there was no evidence of edema, deformity, or tenderness.  (R. 2006.)  During the visit, she also told the physician that she had been "very physically active at home as she is currently packing and moving to a new house."  (R. 2003.)

One of the most recent physical examinations, from September 3, 2019, shows that the Plaintiff's neck was supple and her musculoskeletal and neurological findings were normal.  (R. 2197.)  Evidence submitted subsequent to the ALJ's decision shows that on September 28, 2019,

she went to the ER, reporting chest pain after being "stopped by the police pulled out of the car handcuffed and slammed against the ground for having improper registration plate on her car . . . ." (R. 109.)  She did not complain of neck or back pain.  She was not in distress, her neck was supple with normal range of motion, she had no edema or tenderness, her muscle tone was normal, she had normal reflexes, and her coordination was normal.  (R. 111.)  None of these findings were inconsistent with the ALJ's RFC or the assessed limitations.

The ALJ's RFC is supported not only by the treatment notes, but by the opinions of the state agency medical consultants.  They both opined that the Plaintiff could stand, walk, or sit for about six hours in an eight-hour workday.  (R. 181, 200.)  Dr. Lorenzo noted that the conclusion was supported by the fact that "[e]xams are stable with no focal neuro findings and documented steady gait function."  (R. 201.)  The consultants opined that the Plaintiff could frequently lift or carry up to ten pounds and occasionally climb ramps/stairs/ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl.  (R. 180-81, 200-201.)  These findings remained consistent with the record, even though the reviewers did not have access to the subsequent records. The ALJ's RFC was also supported in part by Dr. Martin's 2019 medical report.  She concluded that the Plaintiff could frequently lift and carry objects weighing up to ten pounds and that she could occasionally stoop, crouch, twist, and climb stairs.  (R. 2017.)

In sum, the ALJ considered the Plaintiff's subjective claims of back and neck pain, and determined that her allegations regarding the intensity, persistence, and limiting effects of her pain were not totally consistent with the record evidence.  This conclusion was well within the ALJ's discretion to make, considering that his credibility determination was reasonable.  (*See infra* Part IV.D.)  The ALJ did not err in failing to incorporate more restrictive limitations for the Plaintiff's

back and neck conditions, since the record does not demonstrate that she had limitations related to those conditions that were inconsistent with the RFC.

iv.      **The ALJ Did Not Fail to Incorporate Limitations for the Plaintiff's IBS and Esophageal Spasm**

The Plaintiff argues that the RFC does not incorporate limitations "to accommodate the irritable bowel syndrome and esophageal spasm, conditions the ALJ found significantly impacted work activity and would cause interruptions with consistent work activity, i.e., off task behavior like frequent and unpredictable bathroom breaks." (Pl.'s Memo. of L., ECF No. 23-1, at 3.) The Commissioner argues in response that the ALJ properly evaluated the Plaintiff's IBS and esophageal spasm and considered them to be well-controlled with treatment and medication. (Def.'s Memo. of L., ECF No. 28-1, at 11.)

The Plaintiff testified that she suffers from constipation, which causes pain in her abdomen, bloating, and gas. (R. 60-61.) Her testimony is supported by the record, which shows that her gastrointestinal impairments cause bloating and constipation (R. 561, 569, 590, 671, 673, 693, 706, 777, 781, 784, 1049, 1072, 1203, 1586, 1634, 1778, 1847, 1968), as well as abdominal pain. (R. 778, 1203, 1258, 1778, 1846, 1850-52, 2015.) The ALJ agreed that the Plaintiff has some problems with abdominal tenderness and distention but concluded that her constipation was managed with medication. (R. 25; *see also* 561, 783, 1049, 1625, 1847, 1968.) He then concluded that the record does not support her allegation that she has "significant" abdominal pain which severely limits her ability to work. (R. 26.)

The ALJ's conclusions are supported by substantial evidence in the record. The treatment notes show that the Plaintiff's stomach was occasionally distended and/or tender (R. 586, 673, 779, 783, 839, 1071, 1847, 1886, 1983), but that her providers more often reported that her abdomen was soft, non-tender, and her bowel sounds were normal. (R. 557, 562, 570, 605, 611,

42

614, 707, 786, 788, 831, 836, 1051, 1098, 1103, 1117, 1586, 1743, 1864, 1900, 1923, 1970, 1978, 2117, 2163.)  She denied abdominal pain on several occasions.  (R. 1836, 1839, 1843, 1856, 1859, 1863, 1885, 1982, 2117.)  The ALJ also noted that the debilitating abdominal pain that the Plaintiff claimed was inconsistent with her activities of daily living.  "[E]vidence that a claimant is capable of engaging in varied activities despite allegations of severe pain is supportive of a conclusion that her alleged symptoms are not disabling."  *Scitney v. Colvin*, 41 F. Supp. 3d 289, 304 (W.D.N.Y. 2014).  *See also Rusin v. Berryhill*, 726 F. App'x 837, 840 (2d Cir. 2018) (summary order) (concluding that the severe limitations claimed by the plaintiff were inconsistent with the plaintiff's report that he "cooked simple meals daily, left the house daily, can drive, and shopped for groceries every two weeks").  Here, the Plaintiff was able to "care for her personal needs, drive, cook for her children, wash laundry, and grocery shop."  (R. 24.)

The Plaintiff testified that she has diarrhea which occasionally causes incontinence.  (R. 60-63.)  The Plaintiff's Statement of Facts characterizes her as having "severe disabling diarrhea" which would cause her to, among other things, require frequent bathroom breaks.  (Pl.'s Stmt. of Facts, ECF No. 23-2, ¶ 14.)  The Plaintiff's testimony is partially supported by the record, which shows that she occasionally complained of diarrhea.  (R. 677, 1623.)  However, the notations from her treating providers indicated that her IBS primarily caused constipation, not diarrhea.  In addition, the Plaintiff does not provide any evidence in the record, beyond her own testimony, which shows that she would require frequent bathroom breaks.  *See Breyette v. Comm'r of Soc. Sec.*, No. 8:13-CV-366 (GLS), 2014 WL 2533162, at *3 (N.D.N.Y. June 5, 2014) (finding that the ALJ did not err when he did not account for frequent bathroom breaks in the RFC, since "the medical record evidence simply [did] not support or corroborate [the plaintiff's] statements

regarding the frequency, duration, or predictability of her bathroom visits"). Therefore, the ALJ did not err when he did not account for frequent bathroom breaks in the RFC.

The Plaintiff also testified that she has spasms in her throat that interfere with swallowing and breathing. (R. 59-60.) The record shows that she had a distal esophageal spasm and dysphagia[17] secondary to spasm (R. 784), and had her distal esophagus dilated in 2016. (R. 584.) However, the record also supports the ALJ's conclusion that the spasm was well-controlled on medication. (R. 22.) In March 2017, she was started on diltiazem, which "much improved" her esophageal spasm and dysphagia. (R. 671, 673.) In August 2017 and January 2018, Dr. Masoud reported that her dysphagia and spasm were still being managed by the diltiazem. (R. 777, 784.) The most recent GI treatment notes from February 2019 indicated that she had epigastric pressure and occasional dysphagia, but that she was not taking any medication and her esophageal spasm had been well-controlled on the diltiazem. (R. 1636.) The record does not show that the Plaintiff had any difficulty breathing associated with the spasm.

Ultimately, the record shows that there is substantial evidence to support the ALJ's decision to omit gastrointestinal limitations from the RFC. "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and quotation marks omitted).

### v.     The ALJ's Failure to Explicitly Incorporate the Plaintiff's Mental Limitations Was Harmless Error

The ALJ's RFC did not explicitly include the Plaintiff's non-exertional mental limitations. However, it is not *per se* reversible error for an ALJ to formulate the RFC without explicitly

---

[17]     Dysphagia is defined as "difficulty swallowing."  *See Dysphagia*, MayoClinic.org, https://www.mayoclinic.org/diseases-conditions/dysphagia/symptoms-causes/syc-20372028 (last visited April 22, 2021).

mentioning the plaintiff's non-exertional limitations. In *McIntyre*, 758 F.3d at 152, the ALJ failed to incorporate the plaintiff's limitations in maintaining concentration, persistence, and pace into the hypotheticals that he presented to the VE. The Second Circuit held that a failure to explicitly incorporate non-exertional limitations is harmless error if: "(1) medical evidence demonstrates that [the] claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, and the challenged hypothetical is limited to include only unskilled work; or (2) the hypothetical otherwise implicitly account[ed] for [the] claimant's limitations in concentration, persistence, and pace." *Id.* (quotation marks omitted).

Here, the record supports a finding that the Plaintiff would be able to engage in simple, routine tasks, despite her limitations. This conclusion is supported by LADC Chapdelaine's 2017 opinion, Dr. Martin's 2019 opinion, the opinions of the state agency consultants, the treatment notes, and the Plaintiff's activities of daily living. In LADC Chapdelaine's 2017 opinion, he assessed the Plaintiff as having a reduced ability to carry out single-step instructions, focus long enough to finish simple activities, change from one simple task to another, and persist in simple activities (R. 687), but also concluded that she had an average ability to perform basic activities at a reasonable pace, interact appropriately with others, and respond appropriately to authority figures. (*Id.*) In Dr. Martin's 2019 opinion, she checked that the Plaintiff had moderate limitations in interacting with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers; maintaining socially appropriate behavior; performing activities within a schedule; sustaining an ordinary routine without special supervision; and working in coordination with others without being distracted by them. (R. 2019.) She also concluded that the Plaintiff had a marked limitation in completing a normal workday/workweek without interruptions from symptoms. (*Id.*) Despite these limitations, she

also checked that the Plaintiff had "no limitation" or was "not significantly limited" in her ability to remember work-like procedures; understand, remember, and carry out both simple and detailed instructions; ask simple questions or request assistance; maintain attention and concentration for extended periods; make simple work-related decisions; and respond appropriately to changes in the workplace. (R. 2019-20.)

The treatment notes also do not show that the Plaintiff is incapable of performing simple, routine tasks or that she could not perform an occupation with occasional contact with the public. As the ALJ explained, the treatment notes show that the Plaintiff was more often than not "alert, oriented, calm, cooperative, had normal and goal-directed thought process, average intelligence, fair insight, fair judgment, no cognitive issues, and sufficient impulse control" (R. 25), despite her anxiety, depression, and crying during appointments. (R. 733, 736, 739-40, 743, 746, 748-49, 751-52, 755-56, 757-58, 761, 936, 938-39, 945, 947, 951, 953, 956-57, 959-60, 962, 966, 968, 975-76, 982, 986, 990, 994, 998-99, 1003-1004, 1007, 1012-13, 1015, 1019, 1023, 1026, 1030, 1033, 1037, 1559, 1562, 1566, 1571-72, 1583-84.)  She made "moderate" progress with treatment and showed interest in going back to work and adopting a new routine.  (R. 1553, 1557, 1559, 1563, 1567.) She was able to look for work and occasionally do part-time work during the relevant time period. (R. 713, 953, 962, 1003, 1562, 1566.)  She was also able to engage in activities of daily living. *See Jimenez v. Colvin*, No. 12-CV-6001 (PGG/FM), 2016 WL 5660322, at *12 (S.D.N.Y. Sept. 30, 2016) ("The ALJ's findings that the claimant is independent in her activities of daily living . . . . support the ALJ's conclusion that Plaintiff can engage in simple, routine, low stress tasks . . . ." (quotation marks and citations omitted)).  She testified that she drives, does household chores, cooks, and occasionally goes on social outings.  (R. 50-53, 64-65.)

In addition, the ALJ's RFC implicitly accounted for the Plaintiff's limitations. The Plaintiff's mild limitations in understanding, remembering, adapting, and managing herself, as well as her moderate limitations in concentration, persistence, maintaining pace, and interacting with others, were accounted for by limiting her to simple, routine tasks with only occasional interaction with the public. *See Stonick v. Saul*, No. 3:19-CV-01334 (TOF), 2020 WL 6129339, at *13 (D. Conn. Oct. 19, 2020) (limiting the plaintiff to simple, routine tasks that did not require teamwork or working closely with the public accounted for moderate limitations in attention, concentration, and pace; and mild limitations in adapting or managing oneself); *Poole v. Saul*, 462 F. Supp. 3d 137, 162 (D. Conn. 2020) (limiting the plaintiff to "simple routine tasks" "sufficiently accounts for plaintiff's impairments in her ability to sustain concentration, persistence, or pace"); *Hill v. Comm'r of Soc. Sec.,* No. 18-CV-1161L, 2020 WL 836386, at *4-5 (W.D.N.Y. Feb. 20, 2020) (concluding that limiting the plaintiff to "performing simple, routine and repetitive tasks, and simple work-related decisions, and to only occasional interaction with coworkers and the public" adequately accommodates for even marked limitations in adapting or managing oneself); *Broadbent v. Saul,* No. 3:18-CV-02127 (WIG), 2019 WL 4295328, at *5 (D. Conn. Sept. 11, 2019) ("[C]ourts routinely find that a claimant who has moderate limitations in memory and concentration can perform simple, routine tasks."); *Brogdon v. Berryhill,* No. 17-CV-7078 (BCM), 2019 WL 1510459, at *14 (S.D.N.Y. Mar. 22, 2019) (limiting the plaintiff to simple work-related tasks with only occasional contact with others accounted for her memory limitations); *Johnson v. Berryhill*, No. 1:17-cv-00684 (MAT), 2018 WL 4539622, at *6 (W.D.N.Y. Sept. 21, 2018) ("Contrary to Plaintiff's argument, the ALJ included significant mental limitations in the RFC finding, including limiting Plaintiff to simple, routine tasks – a limitation which accounts for [the treating provider's] findings regarding Plaintiff's difficulties in maintaining attention and

concentration, performing complex tasks, and learning new tasks."); *Bendler-Reza v. Colvin,* No. 3:15-CV-01576 (JAM), 2016 WL 5329566, at *7 (D. Conn. Sept. 22, 2016) (finding that limiting the plaintiff to performing only "simple work" accounted for mild limitations in memory and concentration); *Gibbons Thornton v. Colvin*, No. 14-CV-748S, 2016 WL 611041 at *4 (W.D.N.Y. Feb. 16, 2016) ("[T]he determination that Plaintiff should not have consistent contact with the general public accounts for . . . moderate social limitations." (internal quotation marks omitted)); *Reilly v. Colvin,* No. 1:13-cv-00785 (MAT), 2015 WL 6674955, at *3 (W.D.N.Y. Nov. 2, 2015) ("[G]enerally a limitation to only 'occasional' or 'limited' contact with others has been found sufficient to account for moderate limitations in social functioning.").

The record shows that the Plaintiff would be able to perform simple, routine tasks despite her mental health limitations, and the ALJ implicitly accounted for the Plaintiff's limitations in the RFC. Therefore, even if the ALJ erred in failing to explicitly address the Plaintiff's mental health limitations in the RFC, the error was harmless.

### vi.     The ALJ Did Not Fail to Incorporate Limitations for the Plaintiff's Non-Severe Impairments

The Plaintiff asserts that the RFC "must include any limitations caused by [her] non-severe impairments, specifically the shoulder, hand and asthma conditions." (Pl.'s Memo. of L., ECF No. 23-1, at 3.) She says that because the RFC does not incorporate any "reaching, manipulative or environmental restrictions" to accommodate for those conditions, it is not an accurate reflection of her maximum capacity. (*Id.*) A searching review of the record shows that the ALJ did not err when he omitted limitations related to the Plaintiff's shoulder, hand, and asthma conditions.[18]

---

[18]     In addition to these arguments, the Plaintiff quotes her entire "active problem list" and generally asserts that the ALJ failed to account for all her impairments. (Pl.'s Memo. of L., ECF No. 23-1, at 1-3.) This "active problem list" has thirty-three entries, and the Plaintiff does not say what limitations should have been attributed to those impairments. (*Id.*) It is not this Court's function to form arguments on the Plaintiff's behalf, and it is not "required to comb the record in

The Plaintiff's issues with her shoulder are not well-documented.  During her hearing, she testified that her surgeries affected the use of her left arm, including her shoulder.  (R. 54-55, 63-64.)  The ALJ wrote that "[s]he testified that she has pain in her left shoulder and hands as residual effects of the surgeries."  (R. 17.)  The issue with her left arm, and with her shoulder in particular, does not appear elsewhere in the record.  As the ALJ noted, physical examinations done between October 2018 and August 2019 showed that she had a normal musculoskeletal range of motion and normal neurological exams.  (R. 17, 1103, 1847, 1857, 1861.)  In addition, when she was evaluated for physical therapy in June 2019, she reported weakness and pain in her right arm, but she did not report any symptoms in her left arm.  (R. 1932-33, 1936.)  She had "strong" shrugs, arm abduction, elbow flexion, elbow extension, and wrist extension.  (R. 1934.)

The Plaintiff testified that she has arthritis in her fingers, which prevents her from grasping or holding things.  (R. 49.)  In his Step Two analysis, the ALJ determined that this impairment was not severe, pointing out that her musculoskeletal and neurological findings were generally normal (R. 17, 1103, 1847, 1857, 1861), and that an x-ray of her right hand revealed "mild angulation of the 3rd left PIP joint and was otherwise normal."  (R. 17.)  The state agency consultants referred to the findings from the x-ray as "non-severe."  (R. 181-82, 201.)  Other notations of the Plaintiff's hand problems are sparse.  In March 2016, the Plaintiff complained of bilateral hand pain, stiffness, and swelling.  (R. 1165-66.)  In March 2017, she had a nerve conduction study done after she reported numbness in her right foot and arm.  (R. 540.)  The study was normal and there was "no evidence of an active neuropathic process in the right arm or leg."  (*Id.*)  When she had her physical

---

search of evidence in support of Plaintiff's position."  *Johnson v. Colvin*, No. 13-CV-6319-CJS, 2014 WL 1394365, at *6 (W.D.N.Y. Apr. 9, 2014).  The Court declines to address all the conditions in this "active problem list," since the Plaintiff's counsel has failed to sufficiently explain or support her position on most of them.

therapy evaluation in June 2019, she reported an "inability to open tight containers/jars due to R

UE weakness." (R. 1936.)  She showed some decreased sensation in her right arm, though her

grips were "strong left, strong right." (R. 1934.)  While the Plaintiff questions the ALJ for not

including manipulative restrictions, particularly limitations in grasping or fingering (Pl.'s Memo.

of L., ECF No. 23-1, at 3, 12), there is little in the record to show that she has any such restrictions.

Notably, in Dr. Martin's 2019 opinion, she concluded that the Plaintiff did not have "significant

limitations with reaching, grasping, handling, or fingering objects." (R. 2017.)

The Plaintiff testified that she has asthma, but that it was "light" and she had just started

getting it recently. (R. 72.)  She testified that she sometimes has shortness of breath, triggered by

her anxiety. (*Id.*)  The record shows a diagnosis of asthma and a prescription for an inhaler. (R.

586, 1634, 1877, 1885.)  In assessing the severity of her asthma, the ALJ noted that the Plaintiff

did not appear to require treatment for it in the relevant time period, she had no exacerbations or

hospitalizations, and physical examinations showed that her respiratory system was mostly normal.

(R. 17, 558, 562, 565, 707, 779.)  In addition, her medical providers often noted that she smoked

marijuana frequently. (R. 713, 717, 777, 795, 866, 1049, 1832, 1853, 1878, 1921, 2005, 2117,

2196.)  "The fact that plaintiff has smoked and continues to smoke also belies her claim that she

has severe asthma symptoms." *Kemp v. Comm'r of Soc. Sec.*, No. 7:10-CV-1244 (GLS/ATB),

2011 WL 3876526, at *9 (N.D.N.Y. Aug. 11, 2011), *report and recommendation adopted*, No.

7:10-CV-1244 (NAM/ATB), 2011 WL 3876419 (N.D.N.Y. Aug. 31, 2011).  Finally, none of the

opinions from the Plaintiff's providers mentioned her asthma or concluded that her asthma would

limit her functional abilities. (R. 684-88, 697-99, 772, 818-23, 1257-59, 1986, 1988, 1990-95,

2015-20.)

In sum, the record shows that there is substantial evidence to support the ALJ's decision to omit restrictions related to the Plaintiff's shoulder condition, hand condition, and asthma from the RFC. There is little documentation of these conditions, and the documentation that is in the record fails to show that these conditions limit the Plaintiff's ability to function in ways that are inconsistent with the RFC. The Plaintiff testified that these conditions limit her functional capabilities, but these were subjective complaints—and, as discussed *infra* Part IV.D, the ALJ properly assessed the Plaintiff's credibility in accordance with the regulations and concluded that her subjective complaints of pain and limitation were inconsistent with the record. Therefore, the ALJ did not err in failing to incorporate more restrictive limitations, since the Plaintiff failed to credibly demonstrate that she had limitations related to these conditions which were inconsistent with the ultimate RFC finding.

### D.      The ALJ's Credibility Findings Were Reasonable

The Plaintiff argues that the ALJ failed to adequately evaluate her credibility for two reasons. First, she asserts that "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work." (Pl.'s Memo. of L., ECF No. 23-1, at 28.) She argues that her statements regarding her degree of pain and other subjective limitations should be deemed credible, since she has a good record of working and making efforts to work. (*Id.* at 28-29.) Second, she argues that the ALJ was biased against her because she "does not go to the doctor enough," and thus failed to properly evaluate the credibility of her subjective complaints. (*Id.* at 30-32.) She specifically points to her chronic pain and the "315 references to pain in the record." (*Id.* at 30.)

ALJs have an obligation to consider the plaintiff's subjective complaints when formulating the RFC, but they are "not required to accept the claimant's subjective complaints without question; [the ALJ] may exercise discretion in weighing the credibility of the claimant's testimony in light

of the other evidence in the record." *Genier,* 606 F.3d at 49 (citation omitted).  When evaluating the plaintiff's credibility, the ALJ must first determine whether the plaintiff has a "medically determinable impairment that could reasonably be expected to produce [the plaintiff's] symptoms, such as pain." 20 C.F.R. § 416.929(b).  The ALJ must then assess the credibility of the plaintiff's complaints regarding "the intensity and persistence of [the plaintiff's] symptoms, such as pain" to "determine how [the] symptoms limit [the plaintiff's] capacity for work." § 416.929(c); *see also* SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017).  The Second Circuit has concluded that a good work history "may be deemed probative of credibility," but it "remains just one of many factors appropriately considered in assessing credibility." *Campbell v. Astrue,* 465 F. App'x 4, 7 (2d Cir. 2012) (summary order).  These factors include "the claimant's daily activities, the frequency and intensity of pain, the type, dosage, effectiveness, and side effects of medication, and other treatment that relieves pain." *Jordan v. Barnhart,* 29 F. App'x 790, 794 (2d Cir. 2002) (summary order).  *See also* § 416.929(c)(3).

In this case, the ALJ expressly took the Plaintiff's subjective complaints into account after concluding that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (R. 20.)  He weighed her subjective reports of pain and physical limitation in accordance with SSR 16-3p, considering treatment notes from the Plaintiff's treating providers, her daily activities, and the treatments that she received  (R. 20-23, 26), and concluded that her subjective statements "concerning the intensity, persistence, and limiting effects of these symptoms [were] not fully consistent" with the evidence in the record.  (R. 20.)  His conclusion was not based entirely on the fact that he believed she "does not go to the doctor enough," as the Plaintiff asserts.  (Pl. Memo. of L., ECF No. 23-1, at 30.)  He considered the frequency of the Plaintiff's complaints and the treatments that she received  (R. 24, 26), but he also considered other

factors, including the Plaintiff's daily activities (R. 24-25), lack of consistency between the severity of the alleged impairments and the treatment notes (R. 20-22, 26) and the effectiveness of her medication regimen.  (R. 26.)

Because the ALJ specifically addressed the Plaintiff's subjective complaints in accordance with the regulations, he "was entitled to make a credibility determination regarding [the Plaintiff's] allegations . . . ."  *Jordan*, 29 F. App'x at 794.  The Plaintiff clearly disagrees with the ALJ's findings, and there is evidence in the record that could point to a different conclusion.  However, "[c]redibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable."  *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (quotation marks and citation omitted).  The ALJ's findings are not patently unreasonable here.  Therefore, the ALJ did not commit error when he evaluated the Plaintiff's credibility and found that her subjective symptoms did not limit her to the extent she alleged.

**E.     The ALJ's Step Five Findings Are Supported by Substantial Evidence**

The Plaintiff argues that the Commissioner did not meet his burden of showing that jobs exist in significant numbers in the national economy that she can perform.  (Pl.'s Memo. of L., ECF No. 23-1, at 32.)  The VE listed three jobs that the Plaintiff could perform: "assembler, production (DOT Code: 706.687-010), SVP-2, light, with 9,500 jobs in the national economy; sub assembler, electrical equipment (DOT Code: 729.684-054), SVP-2, light, with 10,000 jobs in the national economy; and compression molding machine tender (DOT Code: 556.685-022), SVP-2, light, with 8,500 jobs in the national economy."  (R. 28.)  The Plaintiff states that these jobs "exist only in very limited numbers in relatively few locations outside of the region where the claimant lives."  (Pl.'s Memo. of L., ECF No. 23-1, at 32 (internal quotation marks omitted).)

There is no formal definition in the Social Security Act of what a "significant" number of jobs is.  However, "courts have generally held that what constitutes a 'significant' number is fairly minimal, and numbers similar to those presented here – between 9,000 and 10,000 jobs [nationally] – have typically been found to be sufficiently significant to meet the Commissioner's burden." *Sanchez v. Berryhill*, 336 F. Supp. 3d 174, 177 (W.D.N.Y. 2018) (internal alterations and quotation marks omitted) (collecting cases).  Therefore, in this case, the VE's testimony sufficiently established that there are a "significant" number of jobs in the national economy that the Plaintiff can perform.

The Plaintiff also argues that the ALJ failed to account for all her limitations in the hypothetical question posed to the ALJ, thereby making it defective.  (Pl.'s Memo. of L., ECF No. 23-1, at 32-33.)  The Second Circuit has held that an ALJ's hypothetical question to a VE "should explicitly incorporate" all of the plaintiff's limitations, including non-exertional limitations. *McIntyre*, 758 F.3d at 151.  As the Plaintiff correctly points out, the ALJ failed to incorporate her non-exertional limitations in the hypothetical.  (Pl.'s Memo. of L., ECF No. 23-1, at 33-35.)  But, as discussed above, substantial evidence in the record demonstrates that the Plaintiff can do simple, routine tasks despite her impairments.  (*See supra* Part IV.C.v.)  In addition, the hypothetical question, which is essentially identical to the RFC finding (*compare* R. 19-20 *with* R. 74-75), implicitly accounted for the Plaintiff's mental limitations.  (*See id*.)  Therefore, any error in failing to explicitly include the non-exertional limitations in the hypothetical question was harmless.

The Plaintiff specifically asserts that, had the ALJ properly accounted for all her limitations, the VE's testimony would have warranted remand, since "these jobs could not be performed if [she] were limited to only occasional handling and fingering" and if she "were off task greater than 12% of the workday or is [sic] she missed more than one day of work a month,

there would be no jobs she could perform." (Pl.'s Memo. of L., ECF No. 23-11, at 33.) The VE testified that an employer would not tolerate any more than 12% off-task behavior from an employee or an employee missing more than one day of work per month (R. 78), but the ALJ did not incorporate any off-task behavior restrictions in the hypothetical question. However, the ALJ rejected LADC Chapdelaine and Dr. Martin's opinions that the Plaintiff would be off-task more than 25% of a workday for being inconsistent with the overall record (R. 24-25, 1993, 2018), a decision which was supported by substantial evidence. (*See supra* Part IV.A.i & iii.) The VE also testified that the jobs could not be performed if the Plaintiff were limited to only occasional handling and fingering (R. 75-76), but the ALJ appropriately concluded that the Plaintiff's hand condition did not cause any more than a minimal limitation in her ability to perform basic work activities. (R. 17.) Furthermore, there is no evidence in the record which suggests that the Plaintiff's conditions limit her to occasional handling and fingering, beyond her own testimony. (*See supra* Part IV.C.vi.)

Because the ALJ properly evaluated the opinion evidence and the Plaintiff's testimony, rejecting those conclusions or allegations which were inconsistent with the record, the hypothetical question was not defective. *See Smith*, 740 F. App'x at 726–27 ("[The plaintiff] criticizes the ALJ's reliance on an RFC that did not incorporate the functional limitations asserted by [the plaintiff's] treating physicians regarding attendance and ability to remain on task. But these opinions were discounted, and their conclusions rejected. The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC *determined by the ALJ* in the fourth step of the sequential analysis. It was therefore proper for the vocational expert to respond to hypotheticals premised on the ALJ's RFC." (internal citation omitted) (emphasis in original)). "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long

as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion and accurately reflects the limitations and capabilities of the claimant involved." *McIntyre*, 758 F.3d at 150 (citations and quotation marks omitted). As discussed above, the ALJ properly weighed the record evidence and his RFC determination was supported by substantial evidence. (*See supra* Part IV.A, C, D.) Therefore, the ALJ appropriately relied upon the VE's testimony at Step Five.

## V.    CONCLUSION

For the reasons stated above, the Court concludes that the ALJ's decision was supported by substantial evidence and free of legal error. Therefore, the Plaintiff's Motion to Reverse the Decision of the Commissioner is **DENIED**, and the Defendant's Motion for an Order Affirming the Commissioner's Decision is **GRANTED**.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c). The Clerk is directed to enter judgment affirming the Commissioner's decision and to close this case.

It is so ordered.

*/s/ Thomas O. Farrish*

Hon. Thomas O. Farrish
United States Magistrate Judge